# BAILEY JONES v. TENNESSEE CENTRAL RAILWAY CO.

Middle Section. April 28, 1928.

No petition for Certiorari was filed.

O. K. Holladay, of Cookeville, for plaintiff in error.
Bockman & Haile, of Cookeville, for defendant in error.

FAW, P. J. According to the usual practice, this case should be styled in this court Tennessee Central Railway Company v. Bailey Jones, as the Railway Company is the plaintiff in error, but, in order to preserve the identity of the case on the records and avoid confusion,

we have styled the case in the caption of this opinion as it appears on the dockets of our court.

Bailey Jones (hereinafter called plaintiff) is the owner of a farm in Putnam county abutting on the roadway of the Tennessee Central Railway Company (hereinafter called defendant), and on which farm there is a residence and outbuildings occupied by plaintiff as a home.

Plaintiff brought this suit against defendant in the circuit court of Putnam county on October 4, 1926, to recover damages to his property which, according to his declaration, had resulted from the wrongful, careless and negligent conduct of defendant in permitting the ditches and culverts theretofore maintained by defendant along its roadbed and right of way through and in the vicinity of plaintiff's farm and home to "become clogged, stopped and filled up so that the stream formerly occupying said ditch, and the surface water accumulated by heavy rains and snows was caused to overflow plaintiff's land."

It is alleged in the declaration that, as a proximate result of the aforesaid overflow of plaintiff's land, "a considerable quantity of tobacco" and other crops on plaintiff's premises, including garden and truck patches, were destroyed, plaintiff's yard fence was washed away, and water and mud accumulated in plaintiff's yard, "creating a great nuisance." Plaintiff's damages are laid in the declaration at $1000, for which he sued.

Defendant filed a plea of not guilty to plaintiff's declaration and, upon the issues thus made, the case was tried to a jury, and the jury found the issues in favor of the plaintiff and assessed his damages at $250. After a motion for a new trial on behalf of defendant had been overruled, the court rendered judgment in favor of plaintiff and against defendant for $250 and all costs, and thereupon the defendant prayed, obtained and perfected an appeal to this court and has assigned errors here.

The "appeal" in this case will be construed to mean an appeal in the nature of a writ of error, as a simple appeal does not lie from a judgment at law. Spalding v. Kincaid, 1 Shan. Cas. 31; Manley v. Chattanooga, 1 Tenn. App. 65.

Through assignments of error, the defendant insists that there was no evidence before the jury upon which a finding of the issues in favor of the plaintiff could be lawfully predicated. This question was raised in the trial court by motion of defendant, made at the close of plaintiff's evidence and renewed at the close of all the evidence, for a directed verdict in favor of defendant, and was again presented in several grounds of the motion for a new trial.

It appears from undisputed proof that plaintiff's property was injured and damaged as a result of the discharge thereon of large

quantities of water, gravel, cinders and mud which flowed along and over defendant's roadway and thence onto plaintiff's premises.

However, it is claimed on behalf of defendant (as stated in the motion for a new trial below) that "the proof shows that the railroad track has been built and maintained for thirty five or forty years and that the surface and other water flowing along there had been flowing as it was flowing at the time of plaintiff's alleged damages, and the defendant would be conclusively presumed to have an easement or right of way by prescription; no suit having been brought or action begun by the plaintiff in said period of more than twenty years."

But there is evidence in the record that, by the construction and maintenance of a ditch and culverts on the north side of its roadway which took care of the water and prevented the overflow of plaintiff's premises, defendant recognized plaintiff's right to protection from overflow, and such was the status until the ditch filled up and became clogged and did not carry off the water during a period of two or three years immediately preceding the institution of this suit. There was, therefore, no assertion by defendant of a right of flowage adverse to plaintiff, and it follows that defendant has not acquired a prescriptive right to overflow plaintiff's land. Railroad v. Hays, 11 Lea 382, 385; Davis v. L. & N. Railroad Co., 147 Tenn., 1, 8, 244 S. W., 483; C. N. O. & T. P. Railway Co. v. Moon, 2 Tenn. App., 477, 481.

It is also insisted for defendant that the injury and damage for which plaintiff is suing was the result of a certain rainfall on June 17, 1926, which produced an extraordinary and unprecedented flood that could not have been reasonably anticipated by defendant, and should, therefore, be characterized as an act of God, for the consequences of which defendant could not be held liable.

But there is evidence by the testimony of plaintiff and other witnesses that the aforementioned ditch and culverts on defendant's roadway had been clogged, and by reason thereof plaintiff's premises had been overflowed to plaintiff's damage on numerous occasions during a period of approximately two and one-half years prior to the aforesaid big rain or "freshet" on June 17, 1926.

Moreover, there was some testimony that the aforesaid heavy rain in June 1926 was not so unprecedented and extraordinary as that it could not have been reasonably anticipated, and this was therefore a question for the jury to settle. On the evidence in the record, we cannot find, as a matter of law, that the rainfall on June 17, 1926, in the locality here in question, was "unprecedented," and of such degree and proportions as that it should be classified as an act of God, in the legal sense of that phrase.

After a careful examination of the record, we are of the opinion, that there was evidence which required the submission of the case to the jury, and that there is evidence to support the jury's finding

of the issue of liability or non-liability in favor of the plaintiff. The questions which we have thus briefly discussed are raised by defendant's first, second, fifth and sixth assignments of error, and these assignments are overruled.

Through its fourth assignment of error the defendant asserts that the trial court erred in rendering a judgment for any amount for the reason that no special damages are proven as required; that the testimony merely gives general estimates as to damage and does not set out any particular thing or particular amount for which damages should be awarded.

The evidence introduced by plaintiff for the purpose of proving the amount of his damages consisted of an estimate, in a lump sum, of what, in the opinion of each witness, should be allowed the plaintiff as "reasonable damages" for the injuries to plaintiff's property resulting from the overflow disclosed by the proof.

The defendant's contention, made through its fourth assignment of error, as we understand it, is that such testimony as that above indicated has no "probative effect;" that it "establishes nothing at all in a true legal sense;" that it is "utterly devoid of any legal force or virtue," and "can have no legal effect whatever." (Coleman v. Bennett, 111 Tenn. 705, 715-716, 69 S. W. 734).

A careful scrutiny of the evidence relating to the amount of damages is necessary to a proper determination of the question thus raised. We will therefore quote all the testimony in the record on that subject.

We quote from the testimony of plaintiff Bailey Jones as follows:

"Q. In view of that situation, what, in your opinion, would be reasonable damages for this condition for the past three years preceding the commencement of this action?

"The defendant excepted to this question on the ground that he couldn't prove damages that way.

"The court overruled the exception, stating that he may answer if he has been damaged and what amount. 'I think that is proper.'

"A. I don't know hardly what it would be worth, for this tobacco and the damage down in the bottom field and not being able to get out to the public road and this yard being filled up here with gravel and cinders and mud.

"Q. What do you consider would be reasonable damages for the injury complained of?

"This was excepted to by the defendant. The court overruled the exception. The defendant excepted to the action of the court.

"A. $1,000 would be very reasonable. I wouldn't have it there for that, but it was there and I can't help it."

. . . . . .

"The Court: You speak of the damages you have sustained, Mr. Jones. You mean the damages you have indicated about occurred prior to the bringing of this suit and not what has occurred since, as I understand it? A. Yes.

"The Court: In other words, the damages could only be recoverable in an action of this kind from the time of the bringing of the suit what accrued prior to that within three years prior and not what accrued since the bringing of the suit."

The defendant excepted to this statement by the court.

"By Mr. Bockman: Q. In speaking of the $1000 you say that is a small or reasonable amount for the injury, do you mean that was before the bringing of the suit? A. Yes, sir.

"Q. And within three years of that time? A. Yes, there was more damage the other side of that, but I am just not saying nothing about that and not going back to that."

. . . . . .

"Q. You say you think you have been damaged $1,000? A. I do.

"Q. I wish you would tell how you figure that up. I want to hear your figures on that, or is that just a guess at it? A. It is an estimate.

"Q. How did you estimate it? A. This water coming down through there and filling up in my yard and some mud and cinders or slag washed in there and it broke the fence down and drowned out about $300 worth of tobacco and went through to the bottom field and it was damaged by washing.

"Q. Did it wash out any? A. Yes, taking the dirt off.

"Q. The head waters, as it went, washed some of the dirt off? A. Yes."

Will Julian testified as follows:

"Q. What, in your opinion, from your knowledge of these premises, was the damage by virtue of this overflow and mud and accumulated filth and trash and gravel? A. I don't know.

"Q. Well, say that condition existed for a period of two or three years. A. Well, if it was mine, I wouldn't be reasonable about the charge I would make on it, because I wouldn't want it there.

"Q. Give us your idea about the damage if you have any? A. Well, I wouldn't think about it being under $500 on account of this mud and water and stuff in his yard. I wouldn't have it in my yard for that.

"Q. Well, you don't know anything about the other damage. You are talking about just the yard and you don't know about the other part at all? A. No, I don't know about that."

Beecher Wallace testified as follows:

"Q. What, considering you are acquainted with the situation, would be reasonable damages accruing to Bailey Jones by virtue of the condition you have described, what do you think would be reasonable? A. Well, that is pretty hard to say.

"Q. For a period of three years prior to November, last. A. Well, I would say, to be reasonable, in my judgment, $500."

H. J. Childress testified as follows:

"Q. Did you notice the condition of Bailey Jones' yard there after that flood? A. Yes, it was pretty well covered up.

"Q. Did you go down and see the condition of his tobacco field and the other field on below that toward Buffalo Valley Station? A. Well, I went down—I don't recollect walking down over the bottom, but I looked over the tobacco field from perhaps over at the dog yard, anyway, sufficiently to see that it was covered up.

"Q. What, in your opinion, would be proper damages for that injury that you observed? A. Do you mean for the tobacco alone?

"Q. No, taking the whole thing, considering the tobacco and all. A. Well, there was the immediate destruction of the crops and the fences. Then there was more or less a permanent damage done to that land due to the overflow and depositing of that gravel, rock and chirt etc.

"Q. Taking all of that into consideration, what do you think would be reasonable damages? A. Probably—I don't know—Five or six hundred dollars. The tobacco crop really had an opportunity of being a good crop.

"Q. It looked like good prospects up to that time for a good crop? A. Yes."

Billy Wallace testified as follows:

"Q. What do you think the damage is that accrued to Bailey Jones because of the lack of those ditches, if any? A. Well, it run in the yard there and filled up above the fence. I don't know. I would think something like $500.

"Q. Now you are speaking of the yard and the place where he goes from his residence to the public road, are you? A. It cut out between the public road and his residence, and cut that ditch out from there and it run in the yard and overflowed the yard and ran in a little orchard he had down there.

"Q. Along close to the dog kennel,—if you know where that is. A. Yes, out there where that is.

"Q. And then the tobacco field below the dog kennel? A. It runs into a little bottom there.

"Q. Do you remember where he had tobacco last year? A. Yes, I remember where he had it.

"Q. In the bottom field below that, did you notice about the overflow down there, whether it overflowed and left settlings and gravel and rock in that field. A. I just noticed the part of it about down to the tobacco. I don't know that I noticed the rest of it.

"Q. You are estimating the damages from there on up? A. Yes, sir, I think so."

Cross-Examination.

"Q. Did you notice that some of the tobacco had been run over by the water, was it something like a quarter or a half an acre? A. Yes, I saw it down there in a little bottom.

"Q. Were you taking that into consideration in your estimate of damages? A. No, I don't know a thing about tobacco. I never raised any in my life.

"Q. Upon what did you base your estimate of damages? A. I was basing it on the water running in his yard and running up against his fence, and in the bottom where it had run and washed gravel in there.

"Q. That was the bottom he had tobacco in, wasn't it? A. Well, I think it ran into the other bottom. I never noticed that so much. I just noticed it in passing there.

"Q. What is that land reasonably worth per acre? A. Right around a man's house, I don't know, but it would be pretty high.

"Q. I mean below the house in the bottom. A. I guess it would be worth $75 to $100 an acre. I don't guess he would take that for it."

S. E. Anderson testified as follows:

"Q. About how much in your opinion did that damage him? A: That is a pretty hard question. I have not investigated it enough to give the real damages.

"Q. Approximate it from what you know of the premises and have seen, you being disinterested, just give us your approximation of the damages?

"By the Court: Your best judgment what you think would be the damages if there is any."

"A. Well, I would think $250 would be a very low estimate on it, while I wouldn't say for certain whether it would be enough or too much, but that is about the best judgment I could give you."

R. L. Alcorn testified as follows:

"Q. Viewing the situation there as you know it and have known it in the past years, tell us about how much he is damaged by virtue of this overflow. A. Well, it would be a great big damage. I don't know how the damage would come about, but I would think he was damaged $500 or more. Now, this fence that is in front of his yard here, that was about eighteen inches

high. I have been knowing that a long time. My father-in-law had it put in there and it nearly filled up to the top of it and when it would rain the water would run up over it and on higher about ten inches above that. That is a rock wall. It run up over the rock wall and he had wire on top of the wall and it run on down through his yard.''

Sam Bartlett testified as follows:

''Q. Knowing the land as you do, you say you have known it twenty years, tell the court and jury, in your opinion, what would be a reasonable compensation to Bailey Jones for damages accruing to him by virtue of this overflow? A. Well, if it was my place, I would think I ought to have six or seven hundred dollars just for the nuisance of it and in cleaning up.

''Q. Do you think that would be reasonable? A. Yes, I think that would take care of the expense of cleaning up and getting this stuff out of the yard and fixing one thing and another.''

Charley Pullum testified as follows:

''Q. Did that damage his premises any in your opinion? A. Yes, I would think it did.

''Q. About how much? A. I don't know how much it damaged him, while it damaged him a whole lot. If a man would have to move that gravel and stuff away, it would cost a right smart to have done it.

''Q. Give us your estimate of what the damages would have been by virtue of that overflow, not only that particular one, but any you may know about. A. Well, I guess, counting the crops— I think they told me it had washed his tobacco crop away maybe at that time. I hadn't thought nothing about how much. I guess it would damage it $500 to $1,000.

''Q. Do you think that would be a reasonable estimate on the damages, $500, at least? A. I guess it would, the way I remember it, the way it was tore up and stuff washed in there.''

All of the witnesses whose testimony we have quoted were introduced on behalf of plaintiff. The defendant offered no evidence concerning the amount of damages.

It may be noted, in passing, that in the foregoing testimony of the plaintiff and some others of his witnesses the washing of a deep gully in plaintiff's ''bottom field'' (west of the ''tobacco patch'') is included in his ''estimate'' of the damages to which, in the opinion of the witnesses, plaintiff was entitled, although plaintiff does not sue for any such injury and damage to his bottom field in his declaration, and there is no general language in the declaration which, in our opinion, would include such damages to plaintiff's bottom field.

We think it apparent from the declaration and the evidence that only recurrent or temporary, as distinguished from permanent, dam-

ages are recoverable in this case. Terminal Co. v. Lellyett, 114 Tenn., 368, 403-404, 85 S. W. 881; Coleman v. Bennett, supra, pp. 716-717.

As said by this court in the case of Aycock v. N. C. & St. L. Railway Co., 4 Tenn. App. Rep., 655, we are not now dealing with an action for personal injuries, "in which elements of damage may be considered by the jury without preliminary estimate of the injury in evidence, or any precise legal guide for determining the amount," but we have here an action for injuries to property, in which damages "are fixed by rules of law, and measurable by pecuniary valuation." 2 Sutherland on Damages, 4 Ed., Sec. 437.

Where the elements of damage are such as to be susceptible of pecuniary admeasurement, there can be no recovery of substantial damages in the absence of evidence as to the extent of the pecuniary loss. 17 Corpus Juris, pp. 123, 125.

The question here is whether the jury had before it any evidence, or, which is, in effect, the same thing, any evidence of probative value, as to the extent of the pecuniary loss resulting to plaintiff from the aforesaid overflowing of his premises. We have already quoted all the testimony in the record on this subject, and it is seen that it consists of a statement by each witness of the gross amount which, in his opinion, the plaintiff should recover of the defendant as "reasonable damages" for the injuries to his property involved in this case. To accept such testimony would be, in effect, to permit the witness to assume the functions of both judge and jury.

In 2 Sutherland on Damages, 4 Ed., Sec. 444, it is said: "Ordinarily a witness is not allowed to give his opinion of the amount of damages a party sustains from a given act or omission, because when he does so he includes the law as well as the fact. It is the duty of the jury to assess the damages according to the rule of law which it is the province of the court to lay down for their guidance; witnesses are allowed only to furnish the data from which the amount is arrived at. And where the injury consists of distinct elements it is not competent to ask a witness to make a general estimate, but he should be asked to estimate the specific items separately."

Although the questions asked the several witnesses in the instant case, with respect to the amount of damages, differ somewhat in phraseology, it is seen that they are, in their general tenor, the same as the questions asked the plaintiff Bailey Jones on that subject, and we may, therefore, take the plaintiff's testimony for illustrative purposes.

Plaintiff was asked and answered as follows:

"Q. What do you consider would be reasonable damages for the injury complained of? A. $1000 would be very reasonable. I wouldn't have it there for that, but it was there and I can't help it."

According to the plaintiff's testimony, the several items for which, in his opinion, he was entitled to compensation, and which he included in his "estimate" of the "reasonable damages" to which he was entitled, were (1) the destruction of his "tobacco crop" on one-half acre of bottom land; (2) the damage done to a crop (we infer a crop of corn) in the "bottom field," which crop he "replanted;" (3) the damage done to the "bottom field" by washing a deep gully therein; (4) the interference with the way of ingress and egress to and from his premises because of the accumulation of water, mud, gravel and cinders in and about the gate leading from his residence and barns to the public road, and (5) the covering of the yard in front of plaintiff's residence with "gravel and cinders and mud."

These several injuries to plaintiff's property involve several distinct elements of damage.

(a) Plaintiff was entitled to recover the value of the one-half acre of growing tobacco at the time of its destruction, and not what it would have been worth if allowed to mature. Railroad Co. v. Channell, 2 Hig. 154; Coleman v. Bennett, supra, p. 715. But we have no means of knowing (and neither did the jury) which of the two rules above mentioned the plaintiff and his witnesses applied—the proper or the improper method. For aught that appears, some of the witnesses may have applied one of the two methods above named, and others of the witnesses may have applied the other method. It is thus seen that in arriving at his "estimate" of the damages which plaintiff suffered by the loss of his tobacco crop, each witness necessarily decided for himself the rule of law which governed the measure of damages.

(b) The proof is extremely meager with respect to the extent of the injury to plaintiff's "crop" in the "bottom field" (west of the "tobacco patch"). It merely appears from plaintiff's statement that "last years crop" (1926) in the "bottom field" was "damaged" but that plaintiff "replanted it and it come on." Two methods suggest themselves by which the compensation for such partial destruction of a growing crop (when definitely proven) might be measured, viz: (1) that of ascertaining its value just before its partial injury and its value immediately afterwards (Railroad Co. v. Channell, supra, pp. 160-161), and (2) the reasonable cost of "replanting." But which of these methods, if either, the witnesses in this case followed in forming their opinions and estimates does not appear.

(c) The plaintiff was not entitled to recover in this case for the washing of a deep gully in his "bottom field," for the reason that his declaration contains no averments broad enough to cover same. Nevertheless the plaintiff included that as one of the items going to make up his "estimate" of the damages. Some of the witnesses, other than plaintiff, did not include the damage to the "bottom field" and others

did, but as to some of the witnesses, it is impossible to ascertain whether or not they included that item.

(d) The plaintiff was entitled to recover compensation for the injury resulting from the interference with the way of ingress and egress to and from his premises, and the covering of the yard in front of his residence with gravel, cinders and mud. These things constituted, in a sense, private nuisances which interfered with plaintiff's use and enjoyment of his property, and he was entitled to recover the reasonable cost of the abatement of the nuisances and the restoration of his property to the condition it was in immediately prior to the overflow, together with compensation for ''injury to the value of the use and enjoyment'' of his property for a time reasonably sufficient to abate the nuisance, which latter injury ''may be measured, to a large extent, by the rental value of the property, and to what extent that rental value is diminished.'' Lellyett v. Terminal Co., supra, p. 404; Harmon v. Railroad, 87 Tenn., 614, 623, 11 S. W., 703; Nashville v. Comar, 88 Tenn., 415, 426, 12 S. W., 1027; Coleman v. Bennett, supra, p. 716.

But the extent to which, if any, the foregoing rules and principles guided the witnesses in forming their opinions and estimates of the damages which plaintiff was entitled to recover does not appear, and, we may add, no instructions were given to the jury concerning the rules by which the damages recoverable, if any, were to be measured. However, no complaint is made of the court's charge.

The testimony hereinbefore quoted was all admitted without objection, except the testimony of plaintiff, and in that instance the objection was overruled and there is no assignment of error in this court complaining of the admission of plaintiff's testimony. But notwithstanding the absence of objection to the introduction of the testimony of the witnesses to the amount of damages, we are of the opinion that there is no evidence on that subject which the jury could properly consider and upon which they could base an assessment of damages for any definite sum. ''Evidence intrinsically destitute of probative quality acquires no new attribute in point of weight by its production in the case.'' 23 Corpus Juris, p. 40; Boston Insurance Co. v. Stone, Court of Appeals, Middle Section,—opinion by Judge Dewitt, January 24, 1927. This principle was clearly recognized in the case of Coleman v. Bennett, supra, although the court there found that the evidence touching the amount of damages was sufficiently specific and definite, and was based on the correct measure of damages applicable to the facts of that case.

Through its remaining assignment of error, the third, the defendant says that the verdict is excessive, for that, if the plaintiff is entitled to any damages whatever, it could only be nominal damages under the facts shown in the record.

In the absence of evidence upon which to base a finding of any definite amount as damages, we cannot say that the amount reported by the jury is excessive. There is evidence from which the jury could find that, by reason of defendant's negligent failure to keep its ditch and culverts open, the plaintiff's premises were overflowed and flooded, and substantial damage and injury was thereby inflicted upon the plaintiff; but we cannot say from the record before us, that $250 is too much or too little.

The case of Hurley and Son v. Buchi, 10 Lea 346, was a suit to recover damages for a breach of a contract for the sale of some "Early Rose" potatoes for seeding purposes. The plaintiff, Buchi, obtained a judgment, and the defendants, Hurley and Son, appealed. The Supreme Court held (1) that the judgment was erroneous, in that, it was based upon an incorrect measure of damages; (2) that the record contained no evidence by which the amount of the damages could be properly measured, and (3) the judgment should be reversed and the case remanded for a new trial. The court said: "The present aspect of this case is such as that a final judgment cannot be rendered, so as to obtain the justice of the case, without evidence as to the relative value of the articles contracted for and those delivered."

In view of the fact that there is no error in the judgment of the trial court in respect to the question of the liability of the defendant to the plaintiff for substantial damages, the judgment in that respect and to that extent, and for costs below, is affirmed. All of defendant's assignments of error, except the fourth, are overruled.

But in view of our conclusion that the fourth assignment of error must be sustained and the judgment for $250 set aside, we think this is a proper case in which to adopt the practice approved and followed in the case of Perkins v. Brown, 132 Tenn., 294, 300, 177 S. W., 1158, and in Aycock v. N. C. & St. L. Railway Co., 4 Tenn. App. Rep., 655 (in which latter case certiorari was denied by the Supreme Court), wherein it was held that a reviewing court may, in its discretion, qualify the order of remand so as to restrict the scope of the new trial ordered, and may, in a proper case, limit the retrial below to the single question of the ascertainment of proper damages.

The assessment of damages against the defendant and in favor of the plaintiff, and the judgment of the court thereon are set aside, and this cause will be remanded to the circuit court of Putnam county for the assessment of damages by a jury under the direction of the court.

The costs of the appeal will be equally divided, and half of same will be adjudged against the defendant Railway Company and the sureties on its appeal bond, and the remaining one-half of same will be adjudged against the plaintiff Bailey Jones.

Crownover and Dewitt, JJ., concur.