# FARMERS UNION BANK OF HENNING et al. v. JOHNSON et al.—181 S. W. (2d), 369.

Western Section.   July 2, 1943.

Petition for Certiorari denied by Supreme Court, December 17, 1943.

Steele & Steele, of Ripley and W. C. Patton, of Halls, for plaintiffs in error.

C. S. Carney and Craig & Durham, all of Ripley, for defendants in error.

KETCHUM, J. This is a proceeding to contest the will of E. J. Jones who died a resident of Lauderdale County on February 11, 1941. A paper writing of date May 13, 1915, purporting to be his last will and testament was admitted to probate in common form in the county court of said county on February 19, 1941. No executor having been named therein the Farmers Union Bank of Henning was appointed administrator of his estate with the will annexed. Thereafter on the petition of Joe E. Johnson, a grandson (the son of a deceased daughter who had been disinherited in said will), the said will and the record of the probate thereof were duly certified to the circuit court of said county for contest.

In that court, upon appropriate pleadings, the said instrument was offered for probate in solemn form and there was a trial before a jury upon an issue of devisavit vel non which resulted in a verdict and judgment that said instrument was not the valid will of the testator. After an unsuccessful motion for a new trial the proponents of said will prayed and were granted an appeal in error to this court. The only assignment of error that presents an issue for the determination of this court is that there is no material evidence to support the verdict.

In the consideration of this assignment of error we shall consider only the evidence that supports the theory and contention of the contestants, and disregard all countervailing evidence.

Bearing this in mind the following facts are undisputed or are stated according to the theory and contention of the contestants.

The said E. J. Jones was approximately 85 years of age at the time of his death and was therefore about 59 years of age at the time of the execution of said will. The will was prepared by Messrs. Baptist & Baptist, a firm of lawyers composed of the Col. N. W. Baptist and R. B. Baptist, now a member of this court, who were at that time engaged in the practice of law at Covington. It was written in the handwriting of Judge R. B. Baptist and was duly executed in the presence of G. E. Cockrill and J. R. Flowers as subscribing witnesses, and no question is made as to the formal execution of it. Judge Baptist who was present at the time it was executed testified that Mr. Jones was a client and personal friend of his father, Col. N. W. Baptist, that he consulted with them at some length about the preparation and execution of his will, and that in the opinion of the witness he was of sound mind at the time.

Mr. Jones was married three times. By his first wife he had one son, Isaac E. Jones, commonly known as Lige, who was 62 or 63 years of age at the time of his father's death, and who is or has been non compos mentis, but there is no evidence of his ever having been in any institution for treatment.

By his second wife the testator had seven children, to-wit: (1) James, who married Dolly Balderson (now Mrs. Dolly Poe), in 1907. James died about 1920 and left surviving him two daughters, both of whom are now married; (2) Mattie, who married Joe E. Johnson in 1912, and who died about 1919 leaving surviving her four children, one of them being the contestant, Joe E. Johnson, Jr.; (3) Charles N.; (4) Henry S.; (5) Laura,

who married one Waller. She died in 1915 leaving seven children surviving her; (6) William; and (7) J. A. or Albert, generally known as Babe.

By his third wife he had two children, Minnie Lee Jones and Frances E. Jones. He was divorced by his third wife about 1910 or 1911, and by the terms of the divorce decree he was required to pay her the sum of $1,000 as alimony, and $1,000 each for the support and maintenance of her two children, Minnie Lee and Frances E. Jones, who were at that time four or five years of age.

By the terms of his will he left his entire estate to six of his children, or to the descendants of any of them who might be dead at the time of his death; but he disinherited four of his children, to-wit; James, Mattie, Minnie Lee and Frances. The fifth item of his will is as follows:

"I love all of my children, but for reasons satisfactory to myself I have excluded from the benefits of this will my four children, to-wit: Jimmie Jones, Mattie E. Johnson, Frances E. Jones and Minnie Lee Jones."

The sole ground relied upon to set aside the will is that he was of unsound mind and lacked the mental capacity to make a will at the time it was executed.

The testator appears to have been a man of rather positive character, strong in his prejudices, his likes and dislikes, uncompromising in his attitude and unforgiving in his nature; and there is evidence from which it is argued that his reason for disinheriting his son James and his daughter Mattie was his great dislike for James' wife, Dolly, and for Mattie's husband, Joe E. Johnson; and that his reason for disinheriting the two children of his third wife was the bitterness engendered by the divorce proceedings, and his intense dislike for their mother. It is also shown that James' wife Dolly,

and Joe Johnson's mother testified for his wife in the divorce proceeding and this is also assigned as another reason for his disinheriting James and Mattie. But it is also shown without dispute that he did not contest the divorce suit.

It is undisputed that he was a thrifty and successful farmer, attentive to his farming interests and capable of handling all of his business affairs. There is no hint or suggestion in the proof that he lacked the mental capacity to manage his business affairs up to the time of his death. He accumulated a personal estate of $26,-523.08, consisting of cash, certificates of deposits and United States bonds; and his real estate was sold in the county court for $10,041 shortly after his death.

In addition to this accumulation of property he gave to each of his children of his second marriage, except James and Mattie, a tract of land when they became of age or married. To Charles and Albert he gave 50 acres each; to William 40 acres, and to Henry 30 acres, and to his daughter Laura Waller he gave —— acres. He did not give any to his son James or to his daughter Mattie. James and his wife lived at home with him for two years after their marriage and he loaned James the money to buy a place and they then moved away. James' wife, now Mrs. Poe, repaid this loan after James' death. James was a dutiful son and the relationship between him and his father was cordial and affectionate, but Mrs. Poe testified that Mr. Jones disliked her and said that she objected to James' visiting him after they moved away. She denied that she objected to James' visiting his father but says she did object to his going to visit him on Sunday instead of going to Sunday School and church. She says James wanted to go and visit his father every Sunday morning, and because she objected to this

Mr. Jones formed a great dislike for her. She also says she noticed a decided change in his attitude towards her after she testified against him in the divorce suit, that he seemed to dislike her intensely, and that she did not go to see him and that he did not come to see her after that.

Mattie was the oldest daughter and lived with him up to the time she married Joe E. Johnson. She had always been a dutiful and affectionate daughter, helped on the farm and in the bringing up of the younger children. She married in 1912 at the age of 18, and died in 1919. Joe Johnson, her husband, testified that he and Mr. Jones never got along after he married Mattie; that his mother testified against Mr. Jones in the divorce suit and that Mr. Jones never forgave her. He said John McIntyre and Bill Lackey also testified against him, and that he was never on good terms with them after that. He said he and Mr. Jones had ''a falling out'' in the spring after he married Mattie in December and that he never went about him after that. Mr. Jones did not go to Mattie's funeral.

Three physicians testified in the case but no one of them expressed the opinion that the testator was of unsound mind or that he lacked the mental·capacity to make a will. Dr. Lacky had known him for 35 or 40 years and had been his regular physician for the last ten years of his life and had attended him during his last illness. He testified that in his long acquaintance with him he had never observed any indication of insanity in his conduct, and gave it as his opinion that he was not of unsound mind. This was the only witness who expressed an opinion as to his mental capacity to make a will. The other medical testimony was in response to hypothetical questions, such as to the effect

that a man might be insane upon some particular subject and not manifest any indication of his insanity until he got on that particular subject; or that a man's hates, prejudices and dislikes might be so great as to unbalance his mind; or that he might be of unsound mind and yet exhibit no manifestation of it until he committed some act of violence; or that he might so brood over his hates and dislikes, and be so influenced by delusions that he would turn against those he loved the most. But these witnesses do not venture the opinion based upon the facts stated in these hypothetical questions that Mr. Jones suffered from any such delusions, or that his prejudices, hates and dislikes were so great as to unbalance his mind, or that he lacked the mental capacity to make a will. On the other hand, testifying from their personal acquaintance with him they agree that he was a good business man and capable of attending to his ordinary business affairs.

The following matters are relied upon as showing a lack of mental capacity in the testator to make a valid will, to-wit:

(1) The fact that he had a serious illness some three or four months prior to the execution of the will. Joe Johnson fixes the date as being about the time his son Joe, Junior, was born which was in March, 1915. He did not know the nature of his illness except that "he was sick a good while, it must have been three or four weeks; he was in a bad shape." There is no evidence that he was suffering from any mental ailment, or that he was incapacitated thereby from attending to his business affairs. So far as appears from the proof his recovery was complete, and the argument is simply that his will was an unnatural will because he disinherited some of his children without any apparent cause and from this

it is argued that his mind was affected by this illness.

█ But the law does not require that a man shall make an equal distribution of his property among his heirs and he is not to be adjudged of unsound mind merely because he makes what may seem to be an unjust or unequal distribution of his estate. He may for reasons satisfactory to himself disinherit certain of his children if he has the requisite mental capacity to know the natural objects of his bounty, to comprehend the kind and character of his property, to understand the nature and effect of his act, and to make a disposition of his property according to some plan formed in his mind.

(2) It is said that the will was an unnatural will because he disinherited certain of his children whom he loved, and without any reason for excluding them from the benefits of his bounty, and that this was especially true as to James and Mattie who had always been dutiful and affectionate children, and had never caused him any trouble or embarrassment.

James was the oldest child of the second marriage, assisted his father in the operation and management of the farm; and the reason assigned for the testator's disinheriting him was his intense dislike for James' wife, Dolly, who had testified against him in the divorce suit some four or five years before the execution of the will, and also because of his belief that Dolly did not like him and did not want James to visit him.

Mattie was the oldest daughter, obedient and affectionate, and helped him in the work on the farm and in bringing up the younger children. It is contended that the testator disinherited her because of his intense dislike for her husband Joe Johnson, and especially because

Joe's mother was a witness against him in the divorce suit.

And it is argued that he disinherited the two youngest children because of the bitterness engendered by the divorce suit and because of his intense dislike for their mother.

The contestants contend that the will is an unnatural one, and that the testator had no just reason for disinheriting these four children, and they rely upon this as an evidence of mental incapacity to make a will. But no presumption of mental incapacity arises from the fact that he made an unequal distribution of his property among his children. He cannot be said to have been crazy merely because he made what may seem to have been an unjust or unfair will. The law on this subject is thus laid down in 68 C. J., page 452, sec. 51:

"The fact that a will may be unnatural, unfair or unjust creates of itself no presumption that the testator was incompetent at the time of its execution. No presumption of mental incapacity arises from the fact that the will makes an unequal distribution of his property among the next of kin, or that he gives property to persons other than the natural objects of the testator's bounty. Any departure from the usual course in which a person prompted by ordinary instincts would have his property go is presumed to have been made by the testator because of reasons rationally conceived which were satisfactory to him."

The testator in the present will stated that it was for reasons satisfactory to himself that he excluded these four children from any benefits in his estate, and it was not for the court or the jury to say that the reasons he had were insufficient, and certainly no presumption is to

be indulged that he was of unsound mind merely because he made what may seem to be an unjust will.

(3) Another matter relied upon as showing his mental incompetency is what is called his unforgiving nature,—his intense dislike for his daughter-in-law, Dolly, and for his son-in-law, Joe Johnson. It is said that he brooded over this to such an extent that his mind became unbalanced and his reason dethroned when he came to execute his will. There is evidence that he frequently expressed his affection for James and Mattie but that he intended to see that Dolly and Joe Johnson and their children never got any part of his estate. He may or may not have had sufficient ground for this intense dislike for his daughter-in-law and son-in-law, but there is no evidence that he ever brooded over it, or that it ever caused him any worry. The most that can be said is that he was strong in his likes and dislikes, and of an unforgiving nature, and that he had nothing to do with those he disliked. But aside from the reasons he may have had for disliking Dolly and Joe, and granting that he had no sufficient reason for disliking them, it is shown that he did dislike them and had nothing to do with them; and they had nothing to do with him. Under these circumstances we do not think his unforgiving nature,—his likes and dislikes, affords any evidence of mental incompetency to make a valid will.

(4) Another fact relied upon as showing that he lacked the mental capacity to make a will is that his son Lige was of unsound mind. There is evidence that the taint of insanity is heritable, and from this it is argued that Lige may have inherited his loss of mental capacity from his father. The force of this argument is greatly weakened, however, by the fact that of the ten children of the testator Lige was the only child of

the first wife, and none of the other children ever showed any signs of insanity. From this we think it can be very plausibly argued that if Lige inherited his tendency toward insanity from either parent it was from his mother rather than his father. We think the fact that the testator was a capable and successful business man and amassed a considerable estate and lived to the age of 85 years without any question ever having been raised as to his sanity is the strongest possible evidence of his mental capacity to make a valid will. And we do not think any of these matters relied upon as showing a lack of mental capacity to make a will afford any material evidence of such mental incompetency.

We have endeavored to state the facts as strongly in favor of the theory of the contestants as the evidence warrants, and disregarding all conflicting evidence offered in support of the contention of the proponents. But we think it must be agreed that notwithstanding his strong likes and dislikes, and his bitter prejudices, and his unforgiving nature, the testator had the necessary understanding and mental capacity to carry on the ordinary business affairs in which he was engaged, not only at the time of the execution of his will, but even up to the time of his death, which occurred some 25 years after the execution of his will. This, we think, indicates that he had sufficient mental capacity to make a valid will. The general rule to this effect is stated in 68 C. J., "Wills," sec. 26, page 430, in the following language:

"It is generally held that less mental capacity is required for the testator to make a will than to carry on business transactions generally, to manage his estate or to make a contract or deed. . . . and a person who is competent to transact ordinary business is generally regarded as competent to make a will."

And according to another standard text,

"Perhaps the shortest and most universal rule given for determining testamentary capacity is that the testator must be able to understand the business in which he is engaged when he makes his will and to appreciate the effect of the disposition made by him of his property.

"The definition next in order of brevity is to the effect that where the testator knows his estate, the object of his affections, and understands the business in which he is engaged, he has sufficient capacity to make a will."

28 R. C. L., "Wills," sec. 35, page 86. And see 68 C. J., "Wills," sec. 23, page 424.

As said by Judge Felts in Melody v. Hamblen, 21 Tenn. App., 687, 694, 115 S. W. (2d), 237, 242:

"This standard is that the testator must be of sound and disposing mind and memory, which is such mind and memory as enables him to know and understand the business in which he is engaged at the time of making his will, i. e., to recollect the property he is about to dispose of, the manner of distributing it, and the objects of his bounty, and to comprehend and appreciate the claims to which he ought to give effect."

And in Bridges v. Agee, 15 Tenn. App., 351, 355, it is said:

"A person may be capable of disposing by will and yet not capable of making a contract or managing his estate. Pritchard on Wills, section 100; Smith v. Harrison, 49 Tenn., 230; Nailing v. Nailing, 34 Tenn., 630; State ex rel. v. Goodman, 133 Tenn., 375, 181 S. W., 312; Fitch v. American Trust Co., Admr., 4 Tenn. App., 87. The test is whether or not the mind of the testator is sufficiently sound to enable him to understand what he is doing in making the will, and when facts are adduced for the purpose of showing the want of such mental

soundness, whether or not such facts are inconsistent with sanity. To avoid the will the evidence must be directed to the very time and act of making the will. Fitch v. Am. Tr. Co., Adm'r, supra. In other words the point at issue is the mental capacity of the testator at the time of the making of the will, but evidence of mental condition both prior and subsequent thereto, within some limits, is receivable for consideration, stress being always properly laid on the truth that these conditions are merely evidential toward ascertaining the mental condition at the precise time of the act in issue. 'The point of time to be looked at is that when the will was executed . . . The will permits of such prior and subsequent incapacity to be given, but unless it bear upon that period, and is of such a nature as to show the incompetency when the will was executed, it amounts to nothing.' 1 Wigmore on Evidence, section 233, pages 291-292.''

See also 28 R. C. L., p. 93, sec. 43; Melody v. Hamblen, supra, 21 Tenn. App., page 695, 115 S. W. (2d), 237.

■ We are not unmindful of the rule that it is our duty to affirm a judgment based upon a verdict of a jury and approved by the trial court if there is any material evidence to support the verdict. But there must be some material evidence. A mere "spark" or "glimmer" of evidence is not sufficient. Our Supreme Court said in Brenizer v. N., C. & St. L. Ry., 156 Tenn., 479, 3 S. W. (2d), 1053, 1054, 8 S. W. (2d), 1099:

"More than a 'scintilla' is requisite. As well said in Louisville & N. R. R. v. Johnson, 161 Ky. 824, 171 S. W., 847: 'The word "scintilla," however, as applied in our practice, does not mean that the case should be submitted to the jury when there is merely a "spark" or a "glimmer" of evidence.' It means that, when there is

some evidence of a material or substantial nature to support the plaintiff's case, the court will not undertake to determine its comparative value or weight, but will leave the determination of the conflict to the jury.''

In this case we find no evidence of a substantial nature, or what is known as material evidence, to support the jury's verdict that the testator lacked the requisite mental capacity to make a valid will. Had the proponents of the will made a motion for a directed verdict at the close of the evidence we think it would have been the duty of the trial judge to grant it. But since no motion for a directed verdict was made, and a verdict against the will was sustained by the trial court and the case is now being tried by us on the assignment of error that there is no material evidence to support the verdict, we sustain the assignment of error and reverse the judgment and grant the proponents a new trial. Code, section 9051.

The costs of the appeal will be adjudged against the contestant Joe E. Johnson, Jr. The costs of the trial court will abide the result of the new trial.

Anderson, P. J., and Henderson, S. J., concur.

Baptist, J., was incompetent and did not participate in the trial of this case.