HAMMOND *v.* UNION PLANTERS NAT. BANK *et al.*

(*Jackson,* April Term, 1949.)

Opinion filed July 9, 1949.

94

WALTER P. ARMSTRONG, SR., and WALTER P. ARMSTRONG, JR., both of Memphis, Tenn. (ARMSTRONG, McCADDEN, ALLEN, BRADEN & GOODMAN, all of Memphis, Tenn., of counsel), for contestants.

CHAS. L. NEELY, WILS DAVIS and OSCAR WELLS, all of Memphis, for executors.

MR. CHIEF JUSTICE NEIL delivered the opinion of the Court.

This is a will contest in which Martha Gene (Halloran) Hammond, the only child of Frank Halloran, contested the will of her father upon the grounds of mental incapacity to make a will and undue influence by her stepmother. There was a trial to a jury in the circuit court upon these issues resulting in a verdict against the will.

Upon appeal to the Court of Appeals there was a judgment reversing the trial court. The court held that there was no material evidence to support the verdict of the jury as to either of the issues. It reversed the case with an order that the said will be probated in solemn form in the county court.

The contestant filed her petition for the writ of *certiorari* in this Court, which was granted because of the importance of the legal question involved. The issues have been fully and ably presented to the Court in oral argument. While the assignments of error appear to involve only factual questions we think it important to a correct decision of the case that consideration be given to certain legal conclusions to be drawn from the facts. Another vital if not the determinative question is whether or not the testimony of an expert medical witness as to the testator's alleged unsoundness of mind is of such probative value as will justify the submission of that issue to the jury.

The Court of Appeals dealt at length with the factual issues, quoting the testimony of numerous witnesses bearing upon the testator's condition of mind both before and at the time the will was executed and reached the conclusion that Frank Halloran was fully capable of making the will now in dispute, and that it was not induced by the undue influence of his wife, Mrs. Marie Foreman Halloran.

The assignments of error are five in number, but they present only the two questions above mentioned. The Court of Appeals is taken to task, quite respectfully of course, as to the court's interpretation of the evidence, as well as erroneous conclusions of law. We cannot undertake to respond to each and every contention or

argument advanced by counsel because it would be well nigh an endless task.

The testator, Frank Halloran, was married four times, and twice divorced. By his second marriage he had one child, who is the contestant of this will. This child was about three years of age when she came to live with testator and his third wife, Mrs. Cordelia Halloran. This was in 1913 when testator was 32 years of age and his bride (Cordelia) was a "childless widow of twenty-eight." Frank and Cordelia Halloran lived happily together for seven years. It appears that this child, Martha Gene Halloran, was a source of great joy to Cordelia. They were devoted to each other. The child had never known her own mother and she called Cordelia "Mother." In 1922 the wife filed a suit for divorce against her husband upon the grounds of drunkenness and cruelty but withdrew it upon his promise to reform. He had become prosperous in the meantime and in 1930 went to Europe with his daughter, Martha Gene. Upon his return he advised his daughter that he did not intend to live with the daughter and Cordelia any longer. For a number of years thereafter they lived apart. On October 20, 1933, a second suit for absolute divorce was brought and a decree obtained. The court awarded her $250 per month, "for and during her natural life, or until she remarries." She was given other property which is not material to the case before us. Following this divorce Frank Halloran began to insist that his daughter should leave her stepmother and come and live with him. He had been drinking whisky to excess since his return from Europe and the daughter refused his request. We think her refusal could be attributed to her affection for her stepmother and also because her

father was given to over-indulgence in the use of liquor. She was later married to Hammond in 1935 and in time became the mother of a son, who is testator's only grandson. Prior to her marriage she was given an allowance of $100 per month, but this was later reduced to $50 per month and discontinued entirely upon her marriage. The testator was married to his fourth wife, Mrs. Marie Foreman Halloran, in 1933. She lived with him until his death on June 12, 1945. There is no evidence that his last wife was possessed of any estate at the time of her marriage.

The will now in contest was duly executed on October 5, 1944, and witnessed by J. C. Lancaster and Mrs. Helen Dorrough. The testator died of diabetes, at the age of sixty-five years, in June of 1945. It is unnecessary to recite the contents of the will except to call attention to the fact that no mention is made therein of his only daughter, Martha Gene, or her child. He left them nothing. He made provision for the continuation of the monthly payments of $250 to his former wife, Cordelia Halloran, in accordance with the divorce decree. Following this provision in the will there appears under "Item 5" the following: "All of the rest and residue of my estate of every kind and character whatsoever, real, personal, and mixed, I give, devise, and bequeath unto my beloved wife, Marie Foreman Halloran, to be hers in fee simple absolute."

The estate of Frank Halloran consisted of stocks and bonds in various corporations, and especially stock in the "Halloran Company", and its total value is estimated by contestant at about $200,000. The basis of the present contest is that from 1930 until the testator's death he was a confirmed alcoholic, and that as a result

of the excessive use of intoxicating liquors his mind had deteriorated to the point that he was without sufficient mental capacity to make a will. To be more specific, contention was made in the court below, and renewed in the Court of Appeals, that he suffered from "delusions" as to his only child, Martha Gene, and that he was mentally incapable of recalling his property and recognizing the claims of those persons who would naturally be entitled to share in his bounty, all because of the excessive use of alcohol.

 Was the Court of Appeals in error in holding that there was no material evidence to sustain these contentions? Counsel for both the petitioner and respondents devote considerable argument to a discussion of the probative value of evidence in contested will cases and particularly as to the quantum of proof that is necessary to carry the case to a jury on the issue of mental incapacity to make a will. They cite a number of cases wherein the rule is dealt with. But we pretermit any discussion of these decisions because in our opinion the same rule applies in contested will cases as in other civil cases. In other words the question of testator's alleged insanity "is to be submitted to the jury on the preponderance of the evidence with consideration of the presumption in favor of sanity." *Pierce* v. *Pierce*, 174 Tenn. 508, 127 S. W. (2d) 791, 795; *McBee* v. *Bowman*, 89 Tenn. 132, 14 S. W. 481; *Pettitt's Ex'rs* v. *Pettitt*, 23 Tenn. 191. The right of the contestant to have the issue of mental incapacity submitted to the jury must rest upon substantial or material evidence at the time the will was made and not upon a "scintilla" or "glimmer" of evidence.

■ We think the Court of Appeals was correct in holding that there was no material evidence that the testator, Frank Halloran, was of unsound mind at the time he executed the will in question; and that there was no evidence that it was induced as the result of fraud and undue influence. Counsel for petitioner-contestant finds much fault with the court's opinion in holding that mental incapacity must relate to the time the will was executed, and that it gave no thought to the proof of insanity prior to that time. The contention is made that if contestant is required to show incapacity at the very moment the testator signed the will that no will could ever be invalidated. The answer to this rather extravagant statement is found in the fact that the court did not go to this extreme. Moreover it is known that wills are being successfully contested on that ground without proof of the testator's state of mind at the moment he signed the will. We find that the court adhered to the well considered rule that there must be "material, substantial and relevant evidence" to show mental incapacity when the will was executed, and in the absence of it there is no issue for the jury, citing *Jones* v. *Tenn. Cent. Ry. Co.*, 8 Tenn. App. 183, 193; 32 C. J. S., Evidence, Section 1034; *Fitch* v. *American Trust Co.*, 4 Tenn. App. 87, 94; *Nashville C. & St. L. Ry.* v. *Sutton,* 21 Tenn. App. 31, 104 S. W. (2d) 834; *Cude* v. *Culberson,* Tenn. App., 209 S. W. (2d) 506. This Court has followed the same rule without exception as shown in cases too numerous to require citation.

The contestant undertakes to minimize the force and effect of the testimony of the two witnesses to the will by saying that their acquaintance and association with Frank Halloran was very limited, that is, to business

transactions. Whether their association with him was of a business or social character, the ultimate question is how well he knew him and for how long a period. There is no doubt but that Mr. J. C. Lancaster had known him for several years; he was trusted by the testator to advise him about important business transactions. The other witness to the will, Mrs. Dorrough, an employee in the bank, was no stranger to him. While she had no contacts with him as Mr. Lancaster had, it appears she had seen him often at the bank and was well acquainted with him.

■ ■ These witnesses were positive, unequivocal, in their testimony that the testator was sober on the day the will was executed and that there was no evidence of unsoundness of mind. It furthermore appears that the testator had made a previous will and placed it in the bank for safekeeping. He had Mr. Lancaster get it out of the vault and the two compared it with the will which is now in controversy. The latter will appears to be in good form. It was evidently drawn by an experienced attorney. Now it is settled by all the authorities that the will itself may be considered along with other evidence in deciding the issue of mental incapacity. When we examined the contents of this will it shows beyond question that the testator knew all about his property, of what it consisted as well as its value. Moreover, it shows that he was especially mindful of his contractual obligations to his former wife, Cordelia Halloran, as well as the claims upon his bounty by his then present wife. The will itself proves without any possibility of doubt that the testator possessed at the time the will was made, two qualities of mind necessary to make a valid will, to wit, knowledge of his property, kind and value, and also

its location, the persons who would naturally have claims upon his bounty. In addition to the foregoing evidence the proponents offered a large number of witnesses who testified to Frank Halloran's ability as a business man and that in their opinion he was of sound mind.

The contestant argues with much zeal that the testator "in the latter years of his life turned over all his property to the Union Planters Bank to manage, was engaged in no active business and merely gave perfunctory approval of the conduct of his affairs by the bank" and cite the testimony of Mr. J. C. Lancaster in support of this insistence. The Court of Appeals made response to the foregoing as follows: "We do not think Mr. Lancaster's testimony supports that proposition. He states that he had handled the testator's matters for him since about 1938; that he had been familiar with his affairs before that time; that he consulted with Mr. Halloran on the buying of different securities and the revenue produced from those securities; that Mr. Halloran had sole control and ownership of the securities and it was necessary to have his approval on every transaction; that on every transaction they discussed the investment, what was offered for approval and different conversations were necessary leading up to the purchase and sale of them; that there were numerous transactions during the year; that he usually made a written recommendation to Mr. Halloran of everything that was done; that Mr. Halloran would look it over then call him once or twice on every transaction; that Mr. Halloran would give him a written authorization to buy or sell whatever was finally decided on."

We think the record fully sustains the above statement of fact. Our conclusion is that the testimony of

Mr. Lancaster as to his business dealings with the testator furnishes strong proof of the fact that the latter exercised sound judgment in handling his property. By no stretch of the imagination could it be interpreted as evidence of insanity.

The sum and substance of all the testimony on behalf of contestant is that for a number of years prior to the making of his will he was a confirmed alcoholic. The witnesses were numerous, including his disinherited daughter, Martha Gene. No one can doubt from an examination of the record that at times he was guilty of unseemly conduct toward his daughter and others as a result of drunkenness. And we think it is fair to say that he continued to drink until about a year before the will was executed. But it cannot be said that he was always drunk and unruly. In fact there is abundant evidence that his conduct when sober was that of a gentleman. The contestant stated that the last time she saw her father in 1944 he was pleasant and agreeable. The Court of Appeals quotes the contestant's husband as saying "that when sober the testator was an affable gentleman." He started drinking in the afternoon and often continued it into the late hours of the night. He was called a "night drinker."

■ There is no question but that for some time prior to the execution of the will the testator had become estranged from his daughter. As a result of this conduct it is argued that he had an insane delusion regarding the daughter and it was for this reason that he disinherited her. But there is no evidence of an insane delusion such as would invalidate this will. All the evidence shows that he had an intense hatred for his former wife, Cordelia, based upon her suit for divorce and alimony.

His dislike for Martha Gene was due to the fact that she took sides with her stepmother and refused to live with him. Moreover, her marriage to Hammond was very displeasing to him. He refused to attend the wedding and gave her nothing in the way of a wedding present. He referred to Hammond at one time in a disrespectful way, calling him a "damned Jew". The mere fact that the daughter was disinherited, in the light of the foregoing undisputed facts, furnishes no ground for the conclusion that the testator was laboring under a delusion when he executed his will.

In *Gass' Heirs* v. *Gass' Ex'r*, 22 Tenn. 278, the testator was supposed to have had an insane delusion upon the subject of what his status would be in the after life. In holding that it was no ground to invalidate the will, Judge Turley said: "But who shall say that the opinion avowed by the testator, as to futurity, is a delusion? Delusion is defined to be, when a patient conceives something extravagant to exist which has no existence but in his own heated imagination, and, having so conceived it, is incapable of being reasoned out of the conception (Shelford on Lunacy, 40), as the fancying things to exist which can have no existence and are impossible, according to the nature of things, as that trees walk (Shelford, 293), the magnifying slight circumstances beyond all reasonable bounds, as if the parent of a child, really blameable to a certain extent in some particulars, takes occasion to fancy her a fiend, a monster, an incarnate devil."

We know of no case wherein we have departed from this well settled principle. When we apply the rule to the facts of the instant case there appears nothing upon which an insane delusion can be founded. If he left his

daughter out of his will because she married a Jew it was not the result of a delusion because it was true. We are not concerned with his reason for thus making his will other than it was not the result of an insane delusion.

■ Numerous witnesses called to testify for the contestant expressed the opinion that the testator was of unsound mind. They had known him socially and based their opinion upon his conduct while under the influence of liquor. But no witness could testify to his state of mind when the will was made. Some of them testified that there was a change in his life and didn't think he was normal when drunk, argued with friends and was always obstinate, full of ego, had patented a furnace that was no good. He on one occasion thought a crooked limb in the grass was a snake; called friends over the phone late in the night; was ugly and overbearing to his wife and daughter when drunk. But we find no contradiction of the proponent's proof that he was sober and of sound mind when the will was executed. The evidence in support of the contestant indicates nothing more than what is generally expected of man under the influence of liquor. Lay witnesses may express an opinion as to the insanity of the testator based upon "facts and acts" which show a mental condition, as was done in the instant case, but their conclusion from these facts does not necessarily create an issue or prevent the Court from finding the true condition as a matter of law. *Rogers* v. *Hickam,* Tenn. App., 208 S. W. (2d) 34, 37; *Fitch* v. *American Trust Co.,* 4 Tenn. App. 87, 95, 101, 102; *Melody* v. *Hamblin et al.,* 21 Tenn. App. 687, 695, 115 S. W. (2d) 237; *Cude* v. *Culberson,* Tenn. App., 209 S. W. (2d) 506, 515.

 Counsel for the petitioner vigorously assail the Court of Appeals' opinion based as it is upon these cases and insist that they are not controlling. While they are not entirely analogous with the instant case we think they are in point. The principles announced represent the weight of authority. The facts of the Fitch case and conclusions of the court are especially applicable here. We are furthermore of opinion that the "facts and acts" related by lay witnesses which occurred prior to the execution of the will and the opinions based thereon are not inconsistent with testamentary capacity. This is bound to be true for the reason that the testator, Frank Halloran, knew all about his property and appreciated the effect of the disposition he made of it. He was, as we have said, well aware of his obligation to those who might lay claim to his bounty. In *Cude* v. *Culberson, supra,* it was said: "No more was required insofar as mental capacity was concerned. *Farmers Union Bank* v. *Johnson,* 27 Tenn. App. 342, 181 S. W. (2d) 369; *Melody* v. *Hamblin,* 21 Tenn. App. 687, 115 S. W. (2d) 237; *Bridges* v. *Agee,* 15 Tenn. App. 351."

The final crux of the controversy is resolved in petitioner's contention that the opinion of an expert witness, based upon a hypothetical question, in addition to the lay witnesses, constitutes substantial and material evidence sufficient to take the case to the jury on the question of mental incapacity.

In formulating the question to be answered counsel for the petitioner undertook to state the substance of acts and facts upon which the lay witnesses had based their opinion. The witness, Dr. Carrol C. Turner who it is claimed was a qualified psychiatrist, answered that in his opinion the testator was of unsound mind and that

such was his condition a year prior to his death, which was about the time the will was executed. The question so framed to elicit the answer as fixing the unsoundness of mind at the time the will was executed. The witness later qualified and explained his foregoing answer as follows: ''I would consider the person such as you describe to be, what I would term, or what is termed in the medical profession as a chronic alcoholic.'' * * * ''he was lacking in normal attributes of a normal individual.'' The counsel then asked the witness: Q. ''Now a man of that type and of that history, would he be able in your opinion to recollect his property, the manner of distribution, the objects of his bounty, and comprehend and appreciate the claims to which he ought to give effect, would he be able to do that?'' The answer was ''that the man lacks judgment. His memory is certainly affected.''

No unbiased mind could conclude from his evidence that as a matter of law the testator was lacking in testamentary capacity. While medical science would no doubt classify a ''chronic alcoholic'' as ''lacking in normal attributes'', and one who ''lacks judgment'' it does not follow that he is without mental capacity to execute a will. ''The law does not require that persons shall be able to dispose of their property with judgment and discretion in order to make a conveyance. It is sufficient that they understand what they are about.'' Sizer's Pritchard on Wills, Section 99; *Fitch* v. *American Trust Co., supra.*

When all the evidence introduced by the contestant is considered in its most favorable light as showing a lack of testamentary capacity we find that it fails to make a jury question. No witness testified to any act or fact indicating that the testator was of unsound mind when

the will was executed. Some of these witnesses had not seen the testator except at short intervals for a number of years before his death. Not one of them claimed to have known anything about his mental condition at or anywhere near the time of making the will, or the circumstances and facts attending its execution. Moreover, the opinions of these witnesses, and also the medical expert, were based upon the fact that Frank Halloran was an ''alcoholic'', whereas the record shows beyond question that he had not touched whisky for more than a year before executing the will. The opinion of the medical expert is not in and of itself sufficient to take the case to the jury because of its inherent weakness. At most it amounts to a mere ''glimmer'' or ''spark'' of evidence showing testamentary incapacity. Its weakness is further accentuated by the fact that the facts and circumstances attending the due execution of the will were not disclosed to him by anybody. He was not shown the will nor was he advised as to its contents. We know of no case holding the opinion of a psychiatrist, which is of such doubtful value that it must be received with caution, is sufficient to make an issue for the jury as against the positive and unimpeached testimony of witnesses to the will as to its due execution, and that at that time the testator was of sound mind.

Contention is further made that the will is unfair and unnatural and that this is evidence of mental incapacity to make a will. The case of *Farmers Union Bank* v. *Johnson, supra,* holds directly to the contrary and upon this case and authorities cited therein the contention is overruled.

The final question for consideration is whether there is any evidence of undue influence such as

would make a jury question. We find no proof in the record that the wife of the testator, who was the chief beneficiary under the will, had anything to do with the preparation and execution of the will in question. She is the only person who is even thought of as having used some influence in securing a bequest. The law is well settled as to what constitutes undue influence, that is being sufficient to invalidate a will. The mere fact that one has an opportunity to influence the testator as where the relationship is that of husband and wife, which is highly confidential, is not sufficient. We know of no rule whereby the wife is precluded from persuading her husband by fair and reasonable argument to make a will in her favor. The burden is upon the contestant to show that the influence exercised was such as to destroy the free agency of the testator to such an extent that the stronger will of the wife overcame the will of her husband. Pritchard on Wills, Section 128; *Fitch* v. *American Trust Co., supra.*

The assignments of error are overruled and the judgment of the Court of Appeals is affirmed.

GAILOR, TOMLINSON, and BURNETT, JJ., concur.

PREWITT, J., not participating.