JEFFERSON *et al. v.* YAZOO & M. V. R. R. Co. *et al.*

(Division A. Jan. 25, 1943. Suggestion of Error Overruled March 8, 1943.)

[11 So. (2d) 442. No. 35232.]

**W. D. Jones** and **John T. Smith**, both of Cleveland, for appellant.

Dugas Shands and Hugh F. Causey, both of Cleveland, and Lucius E. Burch, Jr., and Clinton H. McKay, both of Memphis, Tenn., for appellee.

Argued orally by **John T. Smith**, for appellant, and by Hugh **F**. Causey, for appellee.

**McGehee, J.**, delivered the opinion of the court.

The appellants are the father, mother, brothers and sisters of David Jefferson, deceased, and they bring this

suit against the Yazoo & Mississippi Valley Railroad Company, and Forest Waldrop who was on the occasion complained of acting as a patrolman and special agent of the railroad company and charged with the duty of guarding and protecting its property on the railroad's premises, and the plaintiffs seek by their suit to recover damages for the fatal shooting of the said David Jefferson by the said Forest Waldrop at a time when the latter was engaged about his appointed duties of apprehending persons suspected of stealing coal at the coal chute on the railroad switch yards within the corporate limits of Cleveland, Mississippi, on the night of January 9, 1942. At the conclusion of the evidence offered by the plaintiffs, the trial court granted a peremptory instruction in favor of both defendants and from the judgment entered thereon, dismissing the suit, this appeal is prosecuted.

Appellee Waldrop was introduced by the plaintiffs as an adverse witness and testified that he was a patrolman of the railroad company acting as a special agent under a Mr. Paul, and that it was his duty to "guard and protect the railroad property, on their property," and that he went armed for that purpose; that under the duties of such employment he frequently made arrests on the company's property and turned the accused law-violators over to the local officers; that on the occasion complained of he brought with him two other railroad patrolmen from Clarksdale, Cox and Dennis, and en route picked up the deputy sheriff, Fred Conner, at the Town of Merigold; that they all then proceeded in his automobile to a wooded grove near the railroad right-of-way but on land not belonging to the railroad company, and not far from the coal chute at the switch yard in Cleveland, Mississippi, where they got out of the automobile to let the said Cox and Dennis go onto the right-of-way and down toward the coal chute while the said Waldrop and Conner proceeded down a pathway alongside the wooded grove and parallel with the railroad and met up with the said David Jefferson, a colored man about twenty

years of age, who was carrying a sack of coal on his back toward the negro settlement, when the deputy sheriff asked him "Boy, what you got there?"; that Jefferson replied "Coal"; that he was then asked by Conner "Where did you get it?," and replied "Down by the railroad tracks," and then later stated "Down at the coal chute on the railroad." That, thereupon, Conner told him he was under arrest, and that "I (Waldrop) was Mr. Waldrop with the railroad, and he (Conner) was a Deputy Sheriff, and consider himself under arrest, or something similar to that"; that the appellee Waldrop then called Conner's attention to two more persons who were approaching them in the pathway leading from the general direction of the coal chute, whereupon Conner went to meet them and told the said Waldrop "You hold this boy here, take care of this boy, and I will go on and meet them"; that neither the deputy sheriff nor Waldrop had any warrant for the arrest of Jefferson and that while Waldrop was guarding him with a pistol in his hand, and was holding him by the coat tail, after Conner had left, Jefferson struck Waldrop on the head and face with his fist and freed himself from the hold, by knocking Waldrop loose; that Waldrop then backed away while Jefferson was advancing on him and continuing to strike him with his fist, and fired his pistol once and continued to back away and later fired four more shots, and one of which five shots struck Jefferson near the mouth, ranging downward, another in the right side of the back near the shoulder, which went through his body ranging about one and one-half inches downward, two in the arm and another somewhere in the fleshy part of his body; that all of the shots save the first were fired after Waldrop was knocked down on his knee and that they were all fired while Jefferson was advancing toward him; and it was shown that the fatal shot was the one which entered the right side of his back as aforesaid, ranging downward. No other eye-witness testified except the two persons who had been taken in charge by Conner fifty-eight

steps away, and they said they heard no words passed between Waldrop and Jefferson, although Waldrop testified that when Jefferson first struck him he asked Jefferson "What in the Hell is the matter with you? Have you gone crazy? Behave yourself," as he kept advancing on him. Jefferson was not armed, and the only disparity between his size and that of the appellee Waldrop was slightly in the latter's favor.

It does not appear from the record whether Jefferson had picked up the coal along the railroad tracks where it had jolted off the coal cars, as alleged in the declaration, or had taken it from a coal pile at the chute. No one saw him when he got the coal, but the two other persons taken into custody by Deputy Sheriff Conner testified that Jefferson had inquired of them before going to the railroad about whether he would be able to get some coal down there and that they had told him that he might be able to scrape up a sack full.

It will be seen from the foregoing testimony of the appellee Waldrop that it was a question for the jury to decide as to whether or not the physical facts in regard to the location and range of the shots were in contradiction of the claim that Jefferson was advancing on Waldrop while he was backing away from him and when the shots were being fired, and especially as to whether the fatal shot near the center of the right side of the back of the deceased, which ranged downward as aforesaid, was fired at a time when Waldrop was on his knee as is contended for by the appellees; also as to the reasonableness of the claim that one who is unarmed would advance on another and assault him with his fist while the latter is standing guard over him with a pistol in his hands. No contention is made that at any time during the altercation there was ever any attempt to seize the weapon, although the deceased was in such close proximity as to be able to continue striking the appellee Waldrop in the face until the fatal shot was fired.

It was held in the case of Walters v. Stonewall Cotton Mills, 136 Miss. 361, 101 So. 495, that where the evidence of a witness is susceptible to two interpretations, one favorable to the party offering it and the other unfavorable, the evidence is entitled to go to the jury to determine which interpretation of the statement of the witness is true. In the case of Ivey v. State, 154 Miss. 60, 119 So. 507, 510, the Court held that even though the defendant testified to a state of facts which, if believed, would absolve him from liability, he would not be entitled to a directed verdict if such testimony was not consistent with the physical facts. There the court said: ''We think the physical facts make it a case for the jury. The fact that' one shot was in the back or shoulder blade, the other, the death wound, being in the back of the head, . . . coupled with the attempted explanation of appellant, who testified in the case, were some of the circumstances warranting the submission of the case to the jury.'' To the same effect is the case of Thornton v. State, 178 Miss. 304, 170 So. 541.

The fatal shooting of Jefferson by the defendant Waldrop under the foregoing circumstances, together with the further fact that the claim made by him that his own face was badly bruised during the altercation was contradicted by another witness, makes a case for the consideration of the jury under the plea of self-defense.

It is next urged on behalf of the appellee Waldrop that he is absolved from liability for the reason that he was acting under instructions from the deputy sheriff when undertaking to detain Jefferson while the deputy went to arrest the other two persons suspected of stealing coal, and that he is therefore protected without regard to whether the arrest was legal or illegal. In support of this defense, the rule is invoked that when a known officer summons a bystander for the purpose of assisting him in making an arrest, the bystander is bound to respond, and that whoever in good faith renders assistance and obeys the orders and directions of a known officer

in response to a call for assistance is protected in making an arrest although the officer may be acting wrongfully or without lawful authority, citing 6 C. J. S., Arrest, sec. 16, pp. 616, 617, 4 Am. Jur. 79, 80; and several court decisions, among which is the case of Watson v. State, 83 Ala. 60, 63, 3 So. 441, where the court said: "It is sufficient if the general official authority of the person calling for aid to make arrests is known. When his general power is known, his call will justify the citizen in yielding obedience, unless he has notice of the want of authority in the particular case in which assistance is required." But, assuming for the purpose of this decision that such a bystander is bound to assist a known public officer in making arrests in any event when called upon to do so, and that this would be required of him under Section 1225, Code of 1930, to the effect that "Every person when commanded to do so by an officer seeking to arrest an offender, must aid and assist in making the arrest, and must obey the commands of the officer in respect thereto," it would not necessarily follow that the homicide was justified in the instant case. Furthermore, assuming for the sake of argument alone that the arrest of Jefferson was legal, then neither the officer nor anyone called on to assist him would have been justified in killing him unnecessarily, and the facts relating to that issue are from the determination of the jury under the testimony in this case. Moreover, we do not have a case here where the officer called on the appellee Waldrop as a mere bystander to aid and assist him in making an arrest, but the facts disclose that the presence of the officer at the scene was procured by Waldrop himself and that he was in charge of the situation and directing the movement for the apprehension and arrest of those suspected on that occasion of having stolen coal from his employer. It was at his instance, and upon his calling the attention of the officer to the other two persons who were approaching that he was left to guard the one then in custody, and the issue is therefore whether he killed the deceased in

necessary self-defense to save his life or protect himself from great bodily harm.

Finally, it is urged that the appellee railroad company is not liable because there was no proof that the appellee Waldrop had authority to guard and protect the railroad's property except on its premises. We are of the opinion that there is no merit in this contention since this special agent was admittedly about his appointed duties in trying to apprehend those suspected of having taken the railroad property from its premises, and the fact that he had gotten off of the right-of-way to discharge his appointed duty would not necessarily exonerate his employer from liability.

In the case of Loper v. Yazoo & M. V. R. Co., 166 Miss. 79, 145 So. 743, 745, the court said: "The consensus of authority, and the rule of this court, is, the fact that a servant's conduct was unauthorized does not bring it without the scope of his employment, provided it is 'of the same general nature as that authorized, or incidental to the conduct authorized.'" In that case, the court quoted with approval the announcement in 39 C. J. 1282 to the effect that the phrase, "scope of the employment," adopted by the courts for the purpose of determining a master's liability for the acts of his servants, has "no fixed legal or technical meaning;" and from A. L. I. Rest. Agency, Tent. Draft No. 5, 53, to the effect that, "The ultimate question is whether it is just that the loss resulting from the servant's acts should be considered one of the normal risks of the business in which the servant is employed which that business should bear." And the court further said: "Moreover, disobedience of servants to instructions as to the particular manner in which their duties should be discharged is so frequent as to become a matter of common knowledge of which employers must take notice." In the case of Alden Mills v. Pendergraft, 149 Miss. 595, 115 So. 713, it was held that where the act complained of was in furtherance of the master's business and within the course of the

servant's employment, the master is liable therefor although it was in excess of the authority conferred by master on the servant and was wilfully and maliciously done. To the same effect is the case of Walters v. Stonewall Cotton Mills, supra. It was said that, ''In order to hold a master liable for the act of his servant it is not necessary to show that the act in question was either expressly or impliedly authorized by the master. If the servant at the time of the wrongful act was engaged for the master in the general scope of his employment, though acting contrary to the express instructions of the master, still the latter is liable. Or putting the same principle another way, if the servant, when he committed the wrongful act, was acting in furtherance of the master's business for which he was employed, the master is liable, although the servant in the doing of the act has, contrary to the instruction of the master, stepped beyond his authority.'' [136 Miss. 361, 101 So. 497.] See, also, Southern Ry. Co. v. Hunter, 74 Miss. 444, 21 So. 304; Barmore v. Vicksburg, S. & P. Ry. Co., 85 Miss. 426, 38 So. 210, 70 L. R. A. 627, 3 Ann. Cas. 594. Assuming that the jury should find that the killing was unlawful, it would follow from the facts hereinbefore stated that the liability of the appellee railroad company would be governed by the principles announced in the several decisions last above referred to. In the Barmore case, supra, the court held that in order for the master to escape liability it must be shown that the servant in committing the wrongful act complained of had abandoned his employment and gone about some purpose of his own not incident to his employment.

The action of the court below in granting a peremptory instruction in favor of either or both of the defendants was erroneous, and the judgment of the court in dismissing the suit must therefore be reversed.

Reversed and remanded.