MUTUAL LIFE INS. CO. OF NEW YORK *v.* RATHER, et al.

June 14, 1954

No. 39255 67 Adv. S. 97 73 So. 2d 163

*Lipscomb, Ray & Barksdale,* Jackson, for appellant.

*Smith & Hurdle,* Holly Springs, for appellees.

LEE, J.

John E. and Hugh H. Rather, Jr., as beneficiaries, sued the Mutual Life Insurance Company of New York to recover a double indemnity benefit of $3,000 on the life of their father, Hugh H. Rather, deceased. There was a verdict for the plaintiffs, and the insurance company appealed.

The sole question presented by the pleadings and proof was whether or not the death "resulted directly from bodily injury . . . independently and exclusively of all other causes, and that such bodily injury was effected

solely through external, violent and accidental means, . . ." and not "directly or indirectly from bodily or mental infirmity or disease of any sort . . .", in accordance with the provisions of the policy.

Mr. Rather, 68 years of age, lived in a two-story home in the town of Holly Springs. A back door opened outward onto brick steps, which consisted of three steps. The first two were average, but the bottom step was only 3 or 4 inches in depth. About 3 o'clock in the afternoon of March 16, 1953, Mr. Rather fell on or near the back steps. Mrs. H. F. Gholson and the insured's wife were in the yard at the time. On hearing a call, they ran to the back and found him lying on his right side and face. He was complaining of his hip. His feet were toward, and his head away from, the steps. Dr. Herbert Phillips was called. He found that the right hip was broken, but the patient's heart and lungs were clear and in good condition. At the local hospital, X-rays confirmed the doctor's diagnosis. The injured man was taken to the Methodist Hospital in Memphis, Tennessee, that evening. John E. Rather witnessed the examination at the hospital where weights were placed on the leg, and returned to the hospital the next afternoon about 5 o'clock. At that time the weights were still on the leg. About 2 or 2½ hours later, an orderly was engaged in preparing the patient for an operation the next morning. Mr. Rather complained that it was hurting him to lie on his side; whereupon the orderly allowed him to turn on his back. John E. noticed that his father's face suddenly turned white, his hands were on his chest, he gasped several times, and died before medical aid could be summoned.

The insured had suffered from Parkinson's Disease for about 10 years. The disease affects the nervous system. The sufferer does not lose his muscular strength, but the loss is in the in-co-ordinating movement of the muscles while they are at rest. He had been treated by Dr. Phillips from the inception of the ailment. The doctor

testified that the disease had been arrested for the past 4 years; that it was a moderately advanced case; that, on visits, his patient seemingly had good control of himself; that the trouble was largely with his hands and arms, and when he got control of those members, he could get around, though somewhat slower; and that he could go up and down stairsteps quite well. Several days before the injury, the doctor made a routine physical examination of the insured and found his heart in almost perfect condition, his blood pressure normal, and otherwise he was in good condition.

Dr. Phillips was asked a hypothetical question, based on his long treatment of the insured, his examinations immediately prior to and following the injury, about which he had fully testified, and the symptoms immediately prior to death, as described by John E. Rather. The doctor gave it as his opinion that death resulted from an embolus, or bloodclot, which formed at the situs of the injury, or torn blood vessel, and traveled to and lodged either in the heart or lungs. He was unequivocal in his opinion that Parkinson's Disease in no way caused or contributed to the death.

Lange Butler, a nephew, Mrs. H. F. Gholson, a nurse, and John E. Rather agreed that the insured needed help to dress or undress, to get in or out of bed, to shave, and to feed himself. Butler testified that, at times, he walked as well as anybody; he could go up and down steps freely; he had been down in the basement with his uncle several times, and there was no trouble in negotiating the 15 or 20 steps; his uncle could get around well, and he had never seen or heard of his falling. Mrs. Gholson saw him a number of times walking in the yard without assistance, and thought that he did well. She observed a tremor in his hands, and that he had a shuffling gait. However, he was able to lift her baby, who weighed 35 pounds, without difficulty. John E. testified that his father's bedroom was on the second floor; that he went up and down the stairs two or three times a day, and did

not use the handrail; that he went out into the yard very often; and that he had never fallen but one time, on an occasion when he went to the attic for some eggs, but he was unhurt, and did not break an egg.

The insurance company had paid total disability benefits for the ten year period. The statements of Dr. Phillips, accompanying the insured's applications, were introduced in evidence. Such unsworn statements indicated a greater disability than was reflected in the doctor's sworn testimony. Likewise an unsworn statement of John E. Rather, given to the insurance company after the death of his father, indicated that his father was in worse condition than he testified to at the trial.

 However, it was for the jury to say which of the statements of the doctor and John E. were the truth about the matter—whether those which were made ex parte, or those which were sworn to from the witness stand. Weyen v. Weyen, 165 Miss. 257, 139 So. 608. See also Walters v. Stonewall Cotton Mills, 136 Miss. 361, 101 So. 495; C. & R. Stores, Inc. v. Scarborough, 189 Miss. 872, 196 So. 650; F. W. Woolworth Co. v. Freeman, 193 Miss. 838, 11 So. 2d 447; Jefferson v. Y. & M. V. Railroad Co., 194 Miss. 729, 11 So. 2d 442; Thompson v. Thomas, (Miss.) 69 So. 2d 238.

Appellant contends that its objections to the hypothetical question, namely, that it embraced some facts that had not been shown in evidence, and that Dr. Phillips had not seen the insured, after he was taken to the hospital in Memphis, should have been sustained.

It is true that the doctor did not see the insured after his removal to Memphis. But it would not take a doctor to show the fact that the leg was placed in traction, that is, that weights were attached. Of course, the son could not testify to the medical effect of the symptoms which he observed; but there is no reason why he should not be permitted to tell what he saw, just as anyone else. No doctor was present when the injured man died. In the absence of an autopsy, a doctor in the hospital, in order

to give his opinion as to the cause of death, would have doubtless had to rely on the symptoms which were observed by the son and the orderly.

■■■ The objections were properly overruled for the reason that a medical expert may base an opinion "partly on facts within his own personal knowledge and partly on facts shown by the testimony of others . . .". 32 C. J. S., Evidence, Section 536, pp. 255-6. See also 20 Am. Jur., Evidence, Sections 793-4, pp. 666-7.

Evidently the death resulted from an injury which was received in a fall.

But appellant contends that there is not a scintilla of evidence that the fall itself was accidental.

In Jefferson Standard Life Ins. Co. v. Jefcoats, 164 Miss. 659, 143 So. 842, the engineer of the train saw George Jefcoats about 150 feet ahead, on the outside of the rails, kneeling or crouching back on his heels, facing the train, with his head lowered as though he was looking at the ground in front of him. He completely ignored the ringing of the bell and the cattle alarm. The insurance company pled affirmatively that the deceased committed suicide, and contended that, from those facts, there was no other reasonable hypothesis than that the deceased intended to commit suicide. But there was no proof to show that the deceased had any motive for taking his life. Neither was there proof as to melancholy or financial depression. It was reasoned by the appellee that, if Jefcoats had intended self destruction, he would have placed himself between the rails; that it was just as reasonable to believe that he fell asleep or suddenly became ill; and that his proximity to the tracks was due to inadvertence or miscalculation. The policy, in that case, was for $1,000, but it also contained a double indemnity clause for a like amount, if the death of the insured resulted "from bodily injury . . . directly and independently of all other causes, . . . effected solely through external, violent and accidental means . . ." and not ". . . directly or indirectly from bodily or mental

infirmity . . .''. The court held that, as to the ordinary life benefit, the burden was on the insurance company to maintain its affirmative plea of suicide, but that, as to the double indemnity benefit, the burden was on the plaintiff to show that the death of the insured resulted from external, violent and accidental means; and although there is a presumption against self destruction, since suicide was not embraced within the term ''accidental means'' such burden also required the plaintiff to prove from a preponderance of the evidence that the deceased did not commit suicide.

Continental Casualty Co. v. Daniels, 173 So. 302, was a suit on a policy which insured against death by accident. The deceased, who had been in good health, came in at night from his work, suffering from a wound near his right ear, which was of such character as to make it apparent that it resulted from external and violent means. Two doctors testified. One, that death was the probable result of the wound; the other, that the death was the sole result of an existing disease of the brain. The cause was submitted to a jury, and the verdict for the plaintiff was affirmed.

Metropolitan Life Ins. Co. v. Williams, 180 Miss. 894, 178 So. 477, was a suit to recover for a death from bodily injury caused directly and independently of all other causes by violent and accidental means on account of the septic infection of a wound. There was no direct testimony as to how or by what means the insured received the injury to his hand. The deceased was a blacksmith, and, in his work, he beat out heavy pieces of iron with steam hammers. A part of the process was performed by hand. His wife and a storekeeper saw the deceased, after quitting time, and observed that his hand had been injured. The deceased had been afflicted to some extent with diabetes for about three years. Whether or not the injury was sustained by accidental means, and whether or not the death resulted from the injury directly and independently of all other causes, were the two issues on

which the case was submitted to the jury. The Court said: "As to whether the injury to insured's hand was caused by accidental means, it is not essential that such fact be proved by direct evidence; but where the fact of the injury has been clearly shown, the means by which it was caused may be proved by circumstances, including the nature and appearance of the injury itself, just as any other fact in civil or criminal cases," citing cases. It was said that the wrinkled condition of the skin at the point of injury was a circumstance from which the jury could reasonably infer that the hand was mashed or pinched in an accidental manner while the deceased was performing his duties. In answer to a hypothetical question, which set out all of the known circumstances, a medical expert testified that, in his opinion, the diabetes did not amount to anything, but, on the contrary, in effect, that the man died from septicemia, or blood poison, caused from the septic germs entering the blood stream through a wound. The jury verdict for the plaintiff was affirmed.

It is true that Metropolitan Life Ins. Co. v. Williams, supra, arose upon a policy, governed by the laws of Texas. But the opinion cited Jefferson Standard Life Ins. Co. v. Jefcoats, supra, and Continental Casualty Co. v. Daniels, supra. These cases show that there is no difference in this respect between the Texas rule and the rule in our state. See also Beimdiek v. New York Life Ins. Co., 183 S. W. 2d 379.

The instruction for the plaintiffs required them, in effect, to prove from a preponderance of the evidence that the insured accidentally and unintentionally fell and broke his hip; that the fall and injury were solely the result of such unintentional accident, and not the result of bodily or mental infirmity or disease directly or indirectly; and that the insured, independently and exclusively of all other causes, died as the direct result of a coronary or pulmonary embolus effected solely from the injury sustained by him.

Manifestly the insured fell and broke his hip. The medical proof was to the effect that death resulted from an embolus, which developed on account of the rupture of a blood vessel by the breaking of the hip and that Parkinson's disease had nothing to do with it. In view of the proof that the insured was able to get around very well, to ascend and descend steps freely, that the bottom step was shallower than the others, that he had previously fallen only one time, that his feet were near, whereas his body was away from, the steps, the evidence was sufficient to warrant the jury in finding that the insured accidentally slipped or tripped and fell, and that Parkinson's disease was in no wise responsible therefor.

The judgment of the lower court is therefore affirmed. Affirmed.

*McGehee, C. J.*, and *Hall, Ethridge* and *Gillespie, JJ.*, concur.