OTTO M. CAMURATI d/b/a Dixie Auto Sales and RICHARD EUGENE CAMURATI, individually, Plaintiff-in-error, v. WILLIE D. SUTTON and DAVID H. SUTTON, individually and for the use and benefit of Emmco Insurance Company, Defendants-in-error.—342 S. W. (2d) 732.

Western Section. August 29, 1960.

Certiorari Denied by Supreme Court January 25, 1961.

Emmett Braden, Thomas Johnston, Memphis, for plaintiff in error.

W. J. Chiapella, Thomas A. Buford, Memphis, for defendant in error.

AVERY, P. J. (W. S.).  This suit was originally brought by Willie D. Sutton and David H. Sutton, individually and for the use and benefit of Emmco Insurance Company against Richard Eugene Camurati, d/b/a Dixie Motor Sales and Smith Motor Sales.  It was later amended by proper order of the Court and consent of the parties so as to have the suit run against Richard Eugene

Camurati and Otto M. Camurati, doing business as Dixie Auto Sales. Non-suit was taken as to Smith Motor Sales.

The case was tried to a jury in Division VI of the Circuit Court of Shelby County, Honorable Friel Hastings, Judge, where there was a verdict and judgment in the amount of $3,000 for personal injury to David H. Sutton and $403.50 for plaintiffs' property damage. Defendants filed motion for new trial, which was overruled, to which action of the Court defendants saved exceptions, prayed, were granted and perfected their appeal in error to this Court, the defendants below becoming plaintiffs-in-error and plaintiffs below becoming defendants-in-error in the Court of Appeals.

In this Opinion the parties will hereinafter be referred to by the status they had in the lower Court or by their respective personal names shown in the record.

The damages sued for, both personal injury and property damage, resulted from an accident which occurred on Highway 51 in the State of Mississippi a few miles below the Mississippi-Tennessee line near Memphis. The individual plaintiffs were the owners of a 1958 Ford motor vehicle. The accident occurred on December 12, 1958, about 4:30 to 5:00 o'clock p.m., at which time David H. Sutton was driving the Ford motor vehicle, which was owned by both David H. Sutton and his wife, co-plaintiff Willie D. Sutton. The defendant, Richard Eugene Camurati was driving a Cadillac automobile owned by Otto M. Camurati, d/b/a Dixie Auto Sales Company, by which Richard was employed and Richard had been in to Mississippi ostensibly for the purpose of buying automobiles and bringing them back to his employer at Memphis, Tennessee, for resale. He had with him on that occasion one Tony Salvaggio.

When reference is made in this Opinion to the respective vehicles, they will be referred to simply by the word "Ford" and by the word "Cadillac." The direction in which the respective automobiles were traveling will be by the use of the cardinal point "south", which was the direction the Ford was traveling, and by the use of the cardinal point "north", the direction in which the Cadillac was traveling. Highway 51 is a concrete highway of sufficient width for two driving lanes with no stripe in the center, and runs generally in a southerly direction from Memphis, Tennessee.

The accident described in the pleadings and by the proof is a most unusual one. As these cars approached each other there was a concrete bridge 20 to 30 feet long with concrete banisters approximately at the point near where it was obvious to the drivers of both automobiles that they would meet. The front end of the Ford automobile was driven into the northwest end of the concrete banister on said bridge where it was broken up and the greater part of which rose into the air and came to a stop at the southeast corner of said bridge. The Cadillac automobile began to skid several feet before it arrived at the south end of the bridge, turned in a circular fashion across the center line of said highway and as it swung around it struck the south end of the banister on the west side of said bridge and came to a stop somewhat in an angular fashion more nearly headed in the opposite direction from which it was traveling. There was no collision of the automobiles with each other.

Emmco Insurance Company had the collision insurance on the Ford and paid an agreed amount of damage shown to be $1,610, less $50 or $1,560 to the plaintiffs.

David H. Sutton was injured, and his injuries will be hereinafter referred to. He sued for personal injuries in the amount of $25,000 and the owners of the Ford, both plaintiffs, sought $1,610 for property damage for the benefit of their insurer, Emmco Insurance Company.

The accident having occurred in the said State of Mississippi, the plaintiffs alleged in their declaration the contributory negligence statutes of the Code of Mississippi, Sections 1454 and 1455 as follows:

"Section 1454. In all actions hereafter brought for personal injuries, or where such injuries have resulted in death, or for injury to property, the fact that the person injured, or the owner of the property, or person having control over the property may have been guilty of contributory negligence shall not bar a recovery, but damages shall be diminished by the jury in proportion to the amount of negligence attributable to the person injured, or the owner of the property, or the person having control over the property."

"Section 1455. All questions of negligence and contributory negligence shall be for the jury to determine."

Therefore, we are confronted with a jury verdict determined as provided by the comparative negligence laws of the State of Mississippi.

The negligent acts charged to the defendant are that the driver of the Ford as he approached the bridge in question observed the driver of the Cadillac at a time when both were a short distance from the bridge and that the driver of the Cadillac "suddenly and without warning crossed over the said center line of said Highway 51

south, and into the lane in which plaintiff was operating his vehicle; that in order to avoid a headon collision, plaintiff was forced to swerve his vehicle off of said highway, and in so doing struck the bridge abutment * * *'', and alleges the damage to the automobile and the injury to plaintiff, David H. Sutton, was ''caused by the negligence of defendant as aforesaid in operating his automobile in a reckless and negligent manner and not keeping a proper lookout ahead and in using that portion of the public roadway unlawfully, while same was being used by plaintiff David H. Sutton in the operation of his motor vehicle.''

The plea of the defendants is a simple plea of not guilty.

The proof of the defendant is to the effect that as the Ford approached the end of the bridge nearest it the driver of the Cadillac observed the Ford being driven so that it would hit the abutment or the end of the banister of said bridge; that the defendant applied his brakes while in his proper traffic lane, swerved his car to the left as he saw a part of the Ford vaulting through the air into the traffic lane used by the Cadillac, and in swerving the car to the left to miss that part of the Ford so advancing, the Cadillac swung around so that the rear of the right side struck the end of the banister hereinbefore stated and stopped as hereinbefore set forth.

Assignment of Error No. I is that ''there is no evidence to support the verdict.'' Assignment of Error No. II is that ''the verdict is excessive.'' Assignments of Error Nos. III, IV, V and VI are each levelled at the charge of the Court. Assignment of Error No. I makes it necessary that we carefully review the evidence to determine wheth-

er or not there is any evidence in the record from which the minds of reasonable men might reasonably disagree or such inference as might be drawn from the evidence adduced, both circumstantially and orally, or by either from which a reasonable inference of negligence might be drawn, either direct or contributory.

Pictures of the respective automobiles taken after the accident, the portions of the highway and the bridge in question are exhibited with the record. Not a great deal can be gleaned from the photographs of the respective automobiles except the position where that part of the Ford which came to rest in the traffic lane which was being used or about to be used by the Cadillac came to rest and where the Cadillac came to rest in the traffic lane about to be used by the Ford.

The substance of plaintiffs' testimony is found in his answers on direct examination to the following questions:

"Q. Tell the Court and jury exactly again which direction you were going and what you did and what you observed. A. As I approached that bridge, approximately 100 feet from it, I could see up there, this way (indicating), this Cadillac, the defendant's car, meeting me. There was two people in it, and they were talking to each other. I could see them talking, that is how close they were. He came on my side of the road, on the west side of the highway, and when he veered across the highway, across the line, the second time, I pulled over to keep from hitting him.

"Q. At that point, let me ask you, were you north of the bridge and observed the defendant's car south of the bridge? A. Yes."

The highway at that point is shown by the proof to have been straight and level and there was no obstruction between the two automobiles that could have possibly obscured the view of either driver. A photograph of the highway showing a considerable distance both north and south of the bridge in question and showing the banisters of the bridge in question is filed as Exhibit No. 1 of plaintiffs to the bill of exceptions.

Plaintiff had nine cases of paint in the Ford. He was a painter by trade, at that time working in Hernando, Mississippi. Mr. Sutton states he was ''knocked out'' by the collision of the Ford with the end of the bridge banister and he could not say whether the cars ever struck each other. He lived in Hernando, Mississippi, at the time, drove that highway often and was thoroughly familiar with it.

On cross examination he explains about how he had driven that road that day. He had come into Memphis from Hernando, Mississippi, bought the paint, gone back to Hernando, arriving there about 12 o'clock, used some of the paint, leaving the other in the Ford. He states that in the afternoon without taking the balance of the paint out of the Ford he started back to Memphis to ''pick up a check'' from a Mr. Phillips; that he went in a telephone booth and while there saw Mr. Phillips pass going south, and he got back in the Ford, started back to Hernando without getting any check or making any further effort to get a check.

He was asked and answered the following questions:

''Q. How far away was this car from you when you saw these two gentlemen in the front seat of this

car approaching you, talking? A. Approximately 150 feet.

"Q. In that second come back over the line, how far would you say you were from them? A. Approximately 75 feet, 60 to 75 feet."

He stated that he was driving approximately 45 to 46 miles an hour and that in his opinion the Cadillac was traveling about the same speed.

The adjuster for Mr. Sutton's insurance company testified they paid Mr. Sutton $1,810, less $50 deductible and then gave him $200 for the salvage, making a net payment to him of $1,560. The $1,560 plus the $50 deductible makes $1,610, the amount of property damage sued for.

L. E. Weeks, a State Highway Patrolman who patrols the section of Highway 51 where this accident occurred, went to the scene along with Patrolman Ogg, he had his notes with him at the time he testified which he had made at the scene. He went to the scene before the cars were moved.

The substance of his testimony is that the Ford laid down no skid marks, struck the banister at the northwest corner of the bridge and came to rest at the northeast corner of the bridge. This put the Ford coming to rest in the traffic lane which the Cadillac would have properly occupied had it gone directly on the bridge.

He also said that the Cadillac began to lay down skid marks in its proper lane and that these skid marks veered to the left across the center line and that the Cadillac came to rest at the southwest corner of the bridge, having turned almost clear around. He was specific in his state-

ment that the first skid marks laid down by the Cadillac were in its proper lane of the highway and that they proceeded to the point where the Cadillac came to rest after it had skidded into the bridge abutment on the west side of the road. He gave no testimony about the length of these skids.

The substance of Richard E. Camurati's testimony is stated in his answer to the following questions:

"Q. Would you just tell us in your own words when you first saw this 1958 Ford which you later learned was driven by Mr. Sutton; describe what occurred? A. Well, as I approached the bridge, the 1958 Ford pulled up on the yellow line in the center part of the highway, and that was when I paid particular attention to the car, and as it did, I was getting ready to blow my horn, maybe to move him over or something like that, but he just automatically pulled back on his side of the road. I just figured he was straightening up and I never did see him straighten up; he just didn't straighten up. He pulled off the line and headed right straight for the bridge abutment.

"Q. What occurred then? A. He hit head-on with the bridge abutment.

"Q. And what did you do when you saw that? A. Well, I saw the car hit the bridge and when it did, I applied my brakes as hard as I could and cut my car to the left hard as I could to keep from running into him, because he hit it on the right shoulder, and I knew it would spin the car out in the highway.

"Q. Did you see the car spin out in the highway? A. I saw the car hit the bridge and go up to the

highway like it was spinning out in there, and of course I applied my brakes and tried to spin my car around to keep from hitting him because I knew there was no place for me to go.''

This witness further stated that he first noticed the Ford when it was up on the center line of the road 75 or 100 feet before it reached the bridge, and that the Cadillac was never on any part of the left hand side of the highway until after he had applied his brakes and veered it to the left in an effort to avoid a collision with the Ford. On cross examination he was asked many questions about where he had been and what he had been doing and he answered that he was making an effort to locate used and new cars to purchase for his co-defendant; that he drove by the car lots and through Hernando and Senatobia, turned around and started back to Memphis without stopping because he saw no cars on the lots which he would desire to purchase. He further stated that Tony Salvaggio was with him, but was not employed by him or his employer; was going just as a friend with the thought in mind that if he purchased any automobile Salvaggio would drive one on the return trip.

On cross examination this witness was interrogated about talking to his friend just before the accident and said the only thing he could remember was when the Ford came up on the center line he said ''look at that car'' and mentioned something about it being out of control. He estimated that he noticed the Ford come up on the center line some 75 or 100 feet before he reached the bridge at which time he was approximately the same distance the other side of the bridge. He further stated that the Ford never did cross over the center of the highway, but from that point where he saw it go

upon the center it moved directly toward the abutment of the bridge, or the end of the banister.

Otto Camurati testified in substance that he owns the Dixie Auto Sales business at 650 Union; that he and Richard Camurati and Tony Salvaggio went from that car lot to Clearpool, a part of which he owned; that he went to pick up a car that he had bought from his partner; that Richard Camurati called him after the accident and he went as far as the State line where he met Richard and Tony, but did not go down to where the accident occurred.

The substance of Salvaggio's testimony is that he went with Richard Camurati to Batesville and Senatobia riding around looking for some cars; that they made no stop and started back toward Memphis; that just before the collision he noticed the Ford coming down the slope some 300 feet from the bridge and that it appeared he was getting in the center of the highway and what he observed is stated by him in answer to the following questions:

"Q. Just tell in your own words what occurred then, sir? A. Well, it seemed to me like the man had a heart attack or went to sleep, or something. He never did apply his brakes. I told Dick—I said, 'Dick'—(interrupted)

"Q. Don't say what you told anybody. A. He was coming down there real fast and it looked like he went to sleep or had a heart attack. He didn't apply his brakes or nothing—just turned straight into the corner of the bridge with no brakes or nothing, and parts just flew everywhere. The hood flew off of the car, and the rest of his car went up in the air completely, I would say 12 feet off the ground, and landed over in our lane.

"Q. What action did Mr. Richard Camurati take? A. To keep from hitting his car—there wasn't nothing for him to do but to make a left turn and apply his brakes, which he did, and skidded into the bridge. If he had took a right, we would have went right in the ditch over there."

He estimated the skid marks laid down by the Cadillac to be 30 to 35 feet and that they begin on the right hand side of the center of the highway traveling north. On cross examination he stated that he noticed the Ford as it drove toward them getting over the center of the highway so that the wheels on the left were over just a little bit in the lane of the Cadillac. In describing the movements of the Ford before it hit the bridge he said:

"Well, he was over in our lane, and it looked like he did get back in his lane and a little bit back in ours. It looked like something was wrong with the car; it was out of line or something. It wasn't coming straight; it was kind of swerving on the highway."

He estimated the speed of the Ford at not less than 80 miles an hour when he first observed it. He was asked about talking to Camurati just before the accident and he said he imagined they were and that Camurati had said something to him just before the accident about how the Ford was being driven toward them. He was rigidly examined about what was said at the time the Ford was approaching and he said that Mr. Camurati said "look at that car." This witness also stated that after the Cadillac struck the bridge he was "knocked out" for a few minutes.

██ It is fundamental and many cases could be cited as authority, however, such has been done so many times

that it seems unnecessary, and we simply say that if there is any reasonable, competent and determinative evidence to support the verdict of the jury, it is the responsibility of the Appellate Courts to affirm the verdict when it is approved, as in this case, by the trial court. Likewise and in reverse order it is true that where there is no reasonable, competent and determinative evidence to support the verdict of the jury the verdict of the jury should be set aside. Cude v. Culberson, 30 Tenn. App. 628, 209 S. W. (2d) 506, 507.

In determining whether or not a verdict will be set aside because there is no evidence to support is no denial of the constitutional right to trial by jury when there is no legal doubt as to the conclusions to be drawn from the whole evidence upon the issues. This is true whether the case is being tried under the comparative negligence law, such as is in force in Mississippi and governs the trial of this case, or where the question is one of proximate cause such as is the law in Tennessee: Lasater Lbr. Co. v. Harding, 28 Tenn. App. 296, 189 S. W. (2d) 583; Mock v. Natchez Garden Club, 230 Miss. 377, 92 So. (2d) 562, 563.

In the brief of defendants' counsel on page 4 thereof he has said:

"The Supreme Court of Mississippi had this to say about the Comparative Negligence Statute:

" 'It is for the jury to decide whether it will diminish the damages in proportion to the amount of negligence attributable to the plaintiff when under all the testimony and circumstances thereby shown a part of the negligence contributing to plaintiffs' injuries was attributable to his own negligence, even

if no instruction to this effect is requested by either party.' '' Mutual Life Ins. Co. v. Rather, supra.

It will be observed that the above rule is shown to have been quoted in the case referred to, Mutual Life Insurance of New York v. Rather, 221 Miss. 527, 73 So. (2d) 163. We read this opinion in the Rather case three times in an effort to find that quote, but were unable to do so, we do not say it is not the rule, as quoted, but it is not the language of the Supreme Court in that case. It is, however, the rule deduced by the annotator from the statute in question and the quote is the exact language of the annotator on pages 305, 306 of the Mississippi Code 1942, Vol. 2, Section 1454. It is noted that there is embraced within that rule stated: When Under All the Testimony and Circumstances Thereby Shown A Part of the Negligence Contributing to Plaintiffs' Injuries was Attributable to His Own Negligence. Of course the rule would apply when the evidence is such that a part of the negligence contributing to plaintiffs' injury was attributable to him, but when the record clearly shows that all of the negligence from which the plaintiffs' injury resulted is that of himself, there is no question for the jury.

Where the physical facts are such that belie the truth of oral testimony there can be no weight given to the oral testimony, for it becomes no evidence whatever. To give credit to the oral testimony of David H. Sutton as to the action of the driver of the Cadillac we would have to believe that this Cadillac crossed the center of the road twice, went back into its proper lane twice and thereafter laid down the skid marks within its proper lane. We have to bear in mind that taking the proof in the record as given by him, that the cars were each travel-

ing as much as 40 miles per hour, they would be closing the distance between them at the rate of 80 miles per hour. That distance, he said, was 150 feet when he first observed the Cadillac cross the center of the highway. In one second the distance would have closed by 117 feet, leaving only 33 feet which was but a few feet more than the length of the bridge in question. It would appear, therefore, to be an impossible situation for the Cadillac to have begun to lay down the skids in its proper lane some 30 feet from the bridge before the Ford struck the end of the banister at the other end of the bridge.

The very fact that he invoked the Comparative Negligence statute by his declaration indicates to this Court that he knew he was guilty of some of the negligence which resulted in the damage and injury and his own proof, coupled with the physical facts, show him to be guilty of all the negligence.

Evidence which unexplained will be conclusive, may lose all probative force supplemented and explained by other testimony. Cude v. Culbertson, supra; Knoxville Traction Co. v. Brown, 115 Tenn. 323, 331, 89 S. W. 319, 321; Curry v. Bridges, 45 Tenn. App. 395, 325 S. W. (2d) 87, 91.

Material evidence is defined in Cude v. Culberson, supra [30 Tenn. App. 628, 209 S. W. (2d) 512] as follows:

" 'By material evidence,' says our Supreme Court, 'is meant evidence material to the question in controversy, which must necessarily enter into the consideration of the controversy and by itself, or in connection with the other evidence, be determinative of the case.' Knoxville Traction Co. v. Brown, 115 Tenn. 323, 331, 89 S. W. 319, 321. A conflict 'upon

a detached or separate feature of fact', it continues, 'even though it is material, should not of itself prevent the giving of peremptory instructions. Facts are frequently material which are by no means determinative; and facts are frequently material in themselves, but become immaterial when taken in connection with other facts.' "

In the same case substantial evidence is defined as follows:

"By 'substantial evidence' is meant 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Consolidated Edison Co. of New York v. National Labor Relations Board, 305 U. S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126, 127, 140, per Chief Justice Hughes; Tenn. Cartage Co. v. Pharr, 184 Tenn. 414, 199 S. W. (2d) 119; see also Fitch v. Am. Trust Co., 4 Tenn. App. 87, 94; Farmers Union Bank of Henning v. Johnson, 27 Tenn. App. 342, 355, 181 S. W. (2d) 369; Curry v. Bridges, 45 Tenn. App. 395, 325 S. W. (2d) 87.

Applying the foregoing rules to the facts of this case, what do we have in the record that renders that part of the testimony of David H. Sutton, which might otherwise be competent, of no value or without any weight whatever?

Assuming that what he said about seeing the two men in the Cadillac talking and saw it cross over the center line of the highway, then back into its proper driving lane and cross over the center line again to justify him driving the Ford so far to the outside of his traffic lane that he struck the end of the concrete banister almost in the center of the front end of his car, let us look at his

explanation a moment. He said the Cadillac first crossed the center of the highway when it was about 75 or 100 feet from the bridge and then between that point and the bridge it went back into its proper lane and crossed over again before it got to the bridge, all of which he says occurred before he began to turn his car to the extreme right of his proper driving lane. In other words he said he began to make that turn to the extreme right when the Cadillac came over the center of the road the second time. The positive and undisputed proof of the existing physical facts are that the skids laid down by the Cadillac were in its proper driving lane, that is, to the proper side of the center of said highway, and these skid marks were several feet south of the south end of the bridge, that is where they began, and they continued from where they were first laid down until the Cadillac crossed over the center of the road, turned almost completely around with its right side striking the abutment of the banister of said bridge at its southwest corner. It is without reason to believe that the driver of the Cadillac would have applied the brakes which resulted in laying down these skid marks in his proper driving lane before or at about the time the Ford had hit the banister of the bridge at its northwest corner. Unquestionably as can be seen, by the photographs exhibited with this evidence, had the Cadillac continued in its proper lane it would have collided headon with the part of the Ford which came to rest at the southeast corner of the bridge, which came to rest directly in the traffic lane of the Cadillac. Thus it seems to us that Mr. David H. Sutton, based upon the physical facts revealed by this record, has given no reasonable substantial evidence which can possibly support a conclusion that the negligence of the driver of the

Cadillac caused him to drive into the end of that concrete banister.

██ It, therefore, seems to us that notwithstanding the applicability of the comparative negligence law of the State of Mississippi and the further provision of the Mississippi law that all questions of negligence and contributory negligence are to be determined by the jury, certainly where there is no evidence which would support a reasonable conclusion of negligence, there is nothing left for the jury to compare, and only a question of law is presented.

As we view this case, had it not been positively shown that the skid marks from the Cadillac were laid down in its proper driving lane, under our reported cases wherein we are required to affirm verdicts if there appears to be any competent and substantial evidence to support the verdict of the jury, we would have had to affirm the verdict and the judgment based thereon. With this physical fact, however, had there been a motion for a directed verdict by the defendant, it evidently would have been sustained and since we conclude that there is no negligence whatever shown to have existed on the part of the driver of the Cadillac automobile, there is nothing left to support the verdict which, with the judgment based thereon, is set aside. This being true, any opinion on the other Assignments of Error are pretermitted. Assignment of Error No. 1 is sustained and plaintiffs' case dismissed with cost. Judgment will be entered in accord with this decree.

Carney and Bejach, JJ., concur.