**Freddie GOLD and wife, Goldie Gold, Plaintiffs-Appellees, Cross-Appellants,**

v.

**NATIONAL SAVINGS BANK OF the CITY OF ALBANY, Defendant-Appellant, Cross-Appellee.**

**Nos. 79–1039, 1040.**

United States Court of Appeals, Sixth Circuit.

Argued Oct. 22, 1980.

Decided Feb. 13, 1981.

W. Emmett Marston and Lee L. Piovarcy, Martin, Tate, Morrow & Marston, Memphis, Tenn., for defendants-appellants, cross-appellees.

Charles G. Black, Memphis, Tenn., for plaintiffs-appellees, cross-appellants.

Before EDWARDS, Chief Judge, KEITH and BROWN, Circuit Judges.

KEITH, Circuit Judge.

This diversity case arises out of the alleged breach of a permanent financing agreement by the defendant bank. In answering a special interrogatory, the jury below found that the bank acted fraudulently in refusing to make a permanent loan to the plaintiffs. The jury awarded the plaintiffs $150,000 compensatory and $50,000 punitive damages. The district court, however, granted a judgment n.o.v. regarding the punitive damages and ordered remittitur of $50,000 of the compensatory damages. Both parties appealed. For the reasons discussed below, we affirm the district court's judgment n.o.v. with respect to the punitive damages and reverse the district court's decision not to grant judgment n.o.v. with respect to the compensatory damages.

## FACTS

### I

Plaintiff Freddie Gold, a Memphis real estate developer, approached Percy Galbreath & Sons, Inc., a mortgage banking institution located in Memphis, regarding construction financing of a 32 unit apartment complex in Memphis known as the Overton Square Apartments. Gold had been in the real estate development business for at least 12 years, and for most of that time had used Galbreath both to provide construction financing for his various projects and to locate permanent financing from third parties.

Gold filed his application with Galbreath in the instant case on March 6, 1973. The application called for a 15 month construction loan for $300,000 at 8¾% interest, and as in most of the previous deals between Gold and Galbreath, the latter would be responsible for arranging permanent financing when the apartment complex was completed. It was contemplated that the permanent loan for the apartment complex would have a term of 27 years at 8¾% interest *per annum*. The application also contained the following clause with regard to the permanent loan:

Final working plans and specifications are to be satisfactory to the permanent lender prior to the beginning of construction. Completion of construction will be evidenced by periodic inspections and final approval by the architect, by the lender's representatives and by the municipal authorities.

Later, Galbreath secured a written commitment for permanent financing of Gold's apartment complex from Defendant National Savings Bank of the City of Albany. This commitment incorporated the terms specified in Gold's application to Galbreath. However, paragraph four of the agreement between the bank and Galbreath also provided that the bank's obligation to fund the permanent loan was conditioned on the following:

The apartment building and other improvements located on the mortgaged premises are to be constructed in a good and workmanlike manner and in accordance with the plans and specifications submitted by you to us. At the completion of the construction of the apartment building and other improvements, we shall be furnished with a certification by your architect that the building has been constructed in accordance with such plans and specifications. We shall also have the option of designating our own representative for the purpose of inspecting the construction of the apartment building and other improvements and his determination as to whether such construction has been performed in accordance

with the plans and specifications and as to whether such construction is in a good and workmanlike manner shall be final and conclusive.

On April 6, 1973, Galbreath issued its written commitment to provide the loan package sought by Gold. In addition to providing construction financing, Galbreath agreed to arrange permanent financing under the terms and interest rates originally specified by Gold. However, this commitment contained language identical to that of paragraph four of the Bank-Galbreath agreement which conditioned the obligation of the permanent lender to fund the loan upon the completion of the apartment complex in a manner satisfactory to the permenent lender.

The Galbreath written commitment, which was approved by Gold later, also provided that:

In the event the apartment building and other improvements on the mortgaged premises are not completed in accordance with the provisions of this letter of committment by January 31, 1974, or any other term or condition of this letter of committment is not fulfilled by January 31, 1974, National Savings Bank's commitment to make the mortgage shall, at their option, terminate.

Although Gold had agreed to have the apartment complex completed by January 31, 1974, he was not able to meet the completion date. Galbreath, however, agreed to extend construction financing beyond the January 31, 1974, date and until Gold actually completed the complex. In return, Galbreath increased the interest rate on the construction loan from the original 8¾% rate to 10% *per annum*. The bank also extended its commitment. Under the terms of the agreements between the parties, the bank was entitled to terminate its obligation to provide financing since the complex was not completed by January 31, 1974, but instead the bank extended its commitment on five separate occasions. In return, the bank increased the rate of interest charged for the permanent financing from the original 8¾% to 9¼%.

When Gold finally completed the apartment complex, Galbreath notified the defendant bank. Officials of the bank then arranged an inspection visit so that they could determine to their satisfaction if the complex had been constructed in accordance with the plans and specifications. Bank vice-president R. Boubin and Mr. Peters, a trustee of the bank, arrived in Memphis on October 10, 1974, as part of a multi-state inspection trip that included inspections in Green Bay, Wisconsin, and Knoxville, Tennessee, as well as inspections of other properties in Memphis.

During the course of the two-hour inspection of Gold's apartment complex, Boubin and Peters found a number of apparent deficiencies in the construction of the complex. In their view, these deficiencies were so substantial that construction of the complex could not be deemed in compliance with the plans and specifications. The day after the inspection the defendant bank informed Galbreath that it would not be able to fund the loan because of the deficiencies.

A short time later, Galbreath informed the bank that structural corrections had been made on the complex since the October 10th inspection. Galbreath took the position that the complex was now in compliance with the plans and specifications. Pursuant to paragraph four of the Galbreath commitment with the bank, the parties agreed that the bank should select an architect to determine if the complex had been built in a workmanlike manner and in accordance with the plans and specifications. The architectural firm of Donald J. Stephens Associates, Albany, N.Y., was chosen, and Ronald R. Rucinski, a partner in the firm, came to Memphis on October 30–31 to make the inspection. He found 47 examples of unworkmanlike construction. Therefore, on November 19, 1974, the bank wrote Galbreath and advised that it would not fund the loan.

Gold continued to own the property from November 19, 1974, to March 1976, when he conveyed the apartment complex to Galbreath by deed in lieu of foreclosure. On December 31, 1974, Gold filed this suit

against the National Savings Bank of the City of Albany.

## II

In his complaint, Gold alleged that the defendant bank wrongfully and willfully breached its contract, under the terms and conditions of the permanent loan commitment, by fraudulently declining to fund the loan. The fraud alleged in the complaint was based on the belief that the bank intentionally refused to fund the loan because it wanted to take advantage of higher interest rates made possible by passage of the "Brock Bill."[1] At trial, Gold contended that the bank's explanation that it decided not to fund the loan because of noncompliance with plans and specifications was only pretextual.[2]

The district court correctly ruled that *Railroad v. Central Lumber and Manufacturing Co.*, 95 Tenn. 538, 32 S.W. 635

(1895), provided the applicable law in this case. In that decision the Supreme Court of Tennessee opined that:

> where parties to a construction contract of any kind agree to submit differences, questions of any character arising in connection with the work to the decision of an architect or engineer, the decision of the arbiter thus selected is final, all parties are bound by it unless it be shown that the estimate or conclusion is fraudulent or is so excessive or palpably injust as to imply bad faith or gross neglect. *Id.* at 543, 32 S.W. 635.

After all the evidence was introduced at trial, the district court denied the bank's motion for directed verdict and submitted the following special interrogatory to the jury:

> Was the determination by Ronald R. Rucinski, Architect, that the apartment

1. On October 29, 1974, the United States Congress passed and the President signed a Bill entitled the Debt Obligation and Usury Ceiling Act, commonly referred to as the "Brock Bill." Pub.L.No.93-501, 88 Stat. 1557 (1974). Under this legislation national banks were permitted to charge interest rates not to exceed 13½% per annum in states, such as Tennessee, which had constitutional limits of 10% on permissible interest charges.

2. During his Opening Statement at trial, counsel for the plaintiffs stated:

> There is a provision in the contract that says they (the bank) have a right to come down and inspect the property (the apartment complex). And I believe the language of that section ... says that their inspection of the property and their judgment is final. They have the right to come down and say 'We like it' or 'We don't like it, we ain't going to buy the loan' ... so Gold, right after the Jewish Holiday was over, went out there and corrected and I hope the proof will show and I think it will show that all of the deficiencies set out by these inspectors and Mr. Ruzinski who was sent down to inspect this property were either frivolous or so minor that it wasn't justification for canceling or not buying the loan.

However, the plaintiffs failed to make this showing of frivolity during the trial and failed to introduce other evidence that would have supported an inference of fraudulent intent on the part of the bank or its architect. Rather than being frivolous citations, the 47 deficiencies noted by Rucinski included: (1) an absence

of handrails on exterior concrete stairs; (2) "hundreds" of half-inch drilled holes in the exterior siding of the building which would permit water and moisture to enter the walls which would eventually cause delamination of the plywood and permit moisture to enter the insulation; (3) exterior corners of the plywood were butt jointed together without caps which would permit water to enter the plies of plywood causing delamination; (4) a large number of electrical conduits were not sealed to prevent the entrance of water; (5) no safety disconnect switches on airconditioners; (6) hazardous tripping conditions on certain stairwells; (7) non-compliance with the plans and specifications in the roof decking; (8) missing and faulty drain pipes; (9) unaccessible hot water heater valves; (10) absence of drain pans under certain water heaters; (11) faulty installation of insulation; (12) an inadequate amount of insulation; (13) faulty installation of toilet ducts; (14) faulty construction of certain firewalls; (15) faulty construction of certain heating unit closets and related ductwork; (16) inadequate support in the roofing of the complex; and (17) deviations from the prescribed design of the roof. In fact, as the bank points out in its brief, 29 of the deficiencies noted by Rucinski were also found by Gold's architect, Frank Lansky. Although the plaintiffs called some 18 witnesses during the course of the trial, they did not establish either indirectly or directly that Rucinski's report was given in bad faith or that the bank otherwise fraudulently refused to fund the permanent loan.

building and other improvements were not constructed in accordance with the plans and specifications and were not constructed in a good and workmanlike manner fraudulent or so obviously unjust as to imply bad faith or gross neglect?

—————— ——————
Yes No

The jury answered the interrogatory "Yes", finding that Rucinski's determination had been made in bad faith. After hearing the parties' arguments with respect to damages, the jury awarded $150,000 compensatory and $50,000 punitive damages. However, the district court partially granted the bank's motion for judgment n.o.v. It struck down the punitive damage award and ordered remittitur of $50,000 of the compensatory award. We agree with this ruling.

The district court, however, did not grant the bank's motion for judgment n.o.v. with respect to the jury's compensatory award. Accordingly, the issue presented to this court on appeal is whether there is sufficient evidence in the record to support the jury's finding that the bank's architect, Ronald R. Rucinski, acted in bad faith in determining that the apartment complex was not constructed in accordance with the plans and specifications. For the reasons discussed below, we find that the jury's determination was not supported by sufficient evidence.

**A**

█ It is well settled in this circuit that in diversity cases the federal courts are bound by state law in determining whether there is sufficient evidence to support a jury's verdict. *See Standard Alliance Industries v. The Black Clawson Co.*, 587 F.2d 813, 812–4 (6th Cir. 1978), *cert. denied*, 441 U.S. 923, 99 S.Ct. 2032, 60 L.Ed.2d 396 (1979); *Chumbler v. McClure*, 505 F.2d 489 (6th Cir. 1974); and *Wallace v. Louisville and Nashville Railway Co.*, 332 F.2d 97 (6th Cir. 1974).[3] In Tennessee, the rule of law with respect to appellate review of the sufficiency of evidence is that all the evidence for the prevailing party must be taken as true. Moreover, all reasonable inferences favorable to the prevailing party must be made and all countervailing evidence must be disregarded. *See Phelps v. Magnavox Co. Of Tennessee*, 497 S.W.2d 898 (Tenn. App.1972). However, it is also clear that under Tennessee law there must be substantial and material evidence from which the jury could have based a verdict for the prevailing side. *Id. See also Camurati v. Sutton*, 48 Tenn.App. 54, 342 S.W.2d 732 (1960), and *Cude v. Culberson*, 30 Tenn.App. 628, 209 S.W.2d 506 (1947).

█ Upon a review of the record in the case, we have found no evidence, much less substantial evidence, to support the jury's affirmative answer to the special interrogatory submitted by the court. The plaintiff did introduce evidence showing that the bank refused to fund the permanent loan at

**3.** There is currently a circuit split on the issue of whether federal or state law controls in diversity cases when determining if sufficient evidence has been presented to withstand a motion for judgment n.o.v. *Compare, e. g., Wratchford v. S. J. Groves and Sons Co.*, 405 F.2d 1061 (4th Cir. 1969), and *Kuziw v. Lake Engineering Co.*, 586 F.2d 33 (7th Cir. 1978). *See also* Annot. 10 ALR Fed. 451, 5A Moore's Federal Practice ⁗ 50.06 and 7 Wright & Miller § 2525.

While this circuit has continued to hold that state law determines the sufficiency of the evidence in diversity cases, *see, e. g., Garrison v. Jervis B. Webb Co.*, 583 F.2d 258 (6th Cir. 1978), we have not had occasion to closely examine this issue since *Hanna v. Plummer*, 380 U.S. 460, 466–69, 85 S.Ct. 1136, 1141-42, 14 L.Ed.2d 8 (1965). We note, however, that

the continued vitality of this rule is open to question, especially in light of *Donovan v. Penn Shipping Co.*, 429 U.S. 648, 97 S.Ct. 835, 51 L.Ed.2d 112 (1977) ("The proper role of the trial and appellate courts in the federal system in reviewing the size of jury verdicts is, however, a matter of federal law.") In fact, several circuits which followed this rule earlier now hold that federal law controls. *See, e. g., Denneny v. Spiegel*, 407 F.2d 433 (3rd Cir. 1969), and *Oldenburg v. Clark*, 489 F.2d 839, 841 (10th Cir. 1974).

In this case, as the text of the opinion makes clear, application of either state or the federal rule mandates a judgment for the defendant, since there was no probative evidence of fraudulent intent on the part of the defendant or its architect introduced at trial.

around the same time that the Brock Bill was enacted by Congress, but this fact alone is plainly insufficient to support an inference that the bank's architect inspected the apartment complex with bad faith. The plaintiff introduced no direct evidence of any fraudulent behavior on the part of Rucinski. In fact, there was no evidence introduced showing that bank officials or Rucinski ever discussed the Brock Bill in connection with Gold's apartment complex project. Finally, there was no evidence introduced of any fraudulent intent or motivation on the part of Rucinski to wrongfully issue an unfavorable report on the quality of the workmanship of the construction project.

 Without considering the substantial countervailing evidence supporting the bank's view of the transaction and taking the evidence introduced by Gold in the light most favorable to him, there is still inadequate evidentiary support for a judgment in favor of the plaintiff. As the Tennessee Supreme Court has noted in *Jones v. Seal*, 56 Tenn.App. 593, 409 S.W.2d 382 (1966), "the facts and circumstances proved [at trial] must clearly establish the inference of fraud." 409 S.W.2d at 385. *See also Anderson v. Nichols*, 39 Tenn.App. 503, 286 S.W.2d 96 (1955). A jury cannot render a verdict on the basis of speculation, surmise or conjecture. *See Dayton Veneer & Lumber Mills v. Cincinnati N.O.&T.P. Railway Co.*, 132 F.2d 222 (6th Cir. 1942); *Cecil Corley Motor Co., Inc. v. General Motors Corp.*, 380 F.Supp. 819 (M.D.Tenn.1974), and *Groves v. Witherspoon*, 379 F.Supp. 52 (E.D. Tenn.1974). Therefore, the district court should have granted the defendant's motion for judgment n.o.v. with respect to the award of compensatory damages.

Accordingly, the decision of the district court granting judgment n.o.v. on the question of punitive damages is affirmed and the decision denying judgment n.o.v. on the question of compensatory damages is reversed.